UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
MERLE C. WEST, and                      )        C.A. NO. 1:18-cv-00688
JANICE E. BRADFORD WEST                 )
                                        )
          Plaintiffs,                   )
                                        )
v.                                      )
                                        )
AIR & LIQUID SYSTEMS                     )
CORPORATION, et al.,                    )
                                        )
          Defendants.                   )
_____)

## GENERAL ELECTRIC COMPANY'S MOTION TO TRANSFER PURSUANT TO §1404

Pursuant to 28 U.S.C. § 1404, Defendant General Electric Company ("GE") hereby respectfully moves this Court for an order transferring this case to the United States District Court for the District of Maine.

28 U.S.C. § 1404 allows this Court to transfer an action to any other district where it may have been brought, "for the convenience of the parties and witnesses, in the interest of justice…" As more fully set forth in the attached Memorandum of Law, the events giving rise to Plaintiffs' claims occurred in Maine. Plaintiffs are lifelong residents of Maine and Plaintiff Merle West's employment history involves working for Maine companies almost exclusively, at Maine locations. Plaintiffs have no meaningful connections to Rhode Island. In short, Maine is the more appropriate forum for this case.

**WHEREFORE** Defendant, General Electric Company, respectfully requests that this Court transfer this action to the United  States District Court for the District of Maine and

pursuant to Local Rule CV 7(a)(c)  requests an oral argument on this matter. The estimated required time for an oral hearing will be one half hour.

Dated: February 5, 2019         THE DEFENDANT

GENERAL ELECTRIC COMPANY
By its Attorney,


  /s/ Anne E. Shannon   
Anne E. Shannon
RI Bar: #9591
McCarter & English LLP
265 Franklin St
Boston, MA 02110
Phone: 617-449-6576
AShannon@mccarter.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (none) on February 5, 2019

   /s/ Anne E. Shannon  
Anne E. Shannon

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                                        )
MERLE C. WEST, and                                      )      C.A. NO. 1:18-cv-00688
JANICE E. BRADFORD WEST                                 )
                                                        )
        Plaintiffs,                                     )
                                                        )
v.                                                      )
                                                        )
AIR & LIQUID SYSTEMS                                    )
CORPORATION, et al.,                                    )
                                                        )
        Defendants.                                     )
_____)

**GENERAL ELECTRIC COMPANY'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO TRANSFER PURSUANT TO §1404**

**I.      INTRODUCTION**

Pursuant to 28 U.S.C. §1404, this case should be transferred to the United States District Court for the District of Maine ("District of Maine"). Not only is Plaintiff Merle West ("Mr. West") a current, and lifelong, resident of Maine, the allegations at the heart of Plaintiffs' complaint all occurred in Maine. Specifically, Mr. West alleges exposure to asbestos at various work and construction sites in Maine. Conversely, Plaintiffs do not have any relevant or meaningful connections to Rhode Island. Therefore, as a matter of convenience, and in the interest of justice, the District of Maine is the most appropriate forum for this case.

**II.      FACTS AND BACKGROUND**

On September 5, 2018, Plaintiffs filed their Complaint in Providence County Superior Court alleging that Mr. West's exposure to Defendants' asbestos-containing products caused him to develop mesothelioma. (Ex. A., Complaint; Ex. B., Vol. 1, 13: 16-21). Defendant General

ME1 29176585v.1

Electric Company ("GE") timely removed the matter to this Court.   (Ex. C., Summons and Notice of Removal).

Mr. West is a current, and lifelong, resident of Maine, growing up in Wiscasset, and later moving to Alna, where he still resides with his wife, Defendant Janice Bradford West.  (Exhibit B, Merle West Deposition, Vol. 1, 12:6-8; Vol. 2, 341: 8-13; 304: 13-22; 373: 21-24). At no point has Mr. West ever lived in Rhode Island.  (Vol. 2, 627: 2-20).

All of Mr. West's employment history involves working for Maine companies, and, almost exclusively, at Maine locations.   In 1967, shortly after high school, Mr. West began working at Bath Iron Works ("BIW") in Bath, Maine. (Vol. 2, 341: 14 – 342: 1). Mr. West worked, on and off, at BIW for approximately 25 years.[1] Following BIW, Mr. West spent the remainder of his career with Cianbro, a Pittsfield, Maine contractor where he primarily worked at paper mills and power plants within Maine.  (Vol. 1, 216:12-24; 235: 10-15; 154:23-1; 165: 23-166:18; Vol. 3, 656: 10- 657:8; 664:7-18; Vol. 4, 1077:1-14). While working for Cianbro, Mr. West also participated in a handful of short term projects occurring in Massachusetts, New York and New Hampshire. (Vol. 1, 211: 3-9; 213: 10-13; 216:12-24; 235: 10-16; 154:23-1; 165: 23 - 165:24; Vol. 2, 579: 1-7; 587: 6-17;  Vol. 3, 656: 10- 657:8; 664:7-18; Vol. 4, 1077:1-14).  Mr. West never work in Rhode Island or for a Rhode Island company.  (Vol. 2, 627: 2-20).

Mr. West's medical diagnosis and treatment primarily occurred in Maine. (Vol. 1, 13: 16-18:12;  Vol. 2, 627: 12-14).  Mr. West did not received any medical diagnosis or treatment in Rhode Island.  Id.

---

[1] In 1972  Mr. West left BIW for a brief time to work with a friend as a carpenter in Alna, Maine. (Vol. 1, 130: 10-131:20) . He went back to BIW in 1973 until he was laid off in the spring of 1974. (Vol. 1, 131: 17-24; 136: 1-3). After getting laid off, he built his home in Maine, worked for a local contractor, and was self-employed. (Vol. 1, 136: 7-22).  In 1978,  Mr. West was re-hired by BIW.  (Vol. 1, 147: 1-3).

2

### III.   LAW AND ARGUMENT

The District of Maine is the proper forum for this matter.  Pursuant to  28 U.S.C  §

1404(a) "[f]or the convenience of parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought."

28 U.S.C  § 1404(a). "The statute is intended to place discretion in the district courts to

adjudicate motions for transfer according to an individualized, case-by-case consideration of

convenience and fairness."  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 23 (1988).

After first determining whether an action could have been brought in the transfer forum, a

court then considers a number of "public and private" interest factors. Brian Jackson & Co. v.

Eximias Pharmaceutical Corp., 248 F. Supp. 2d 31, 38-39 (D.R.I. 2003).  These factors include:

(1) a plaintiff's choice of forum; (2) ease of access to sources of proof; (3) availability of

compulsory process to compel attendance of witnesses; (4) cost of attendance of willing

witnesses; (5) ease of a view of premises, if necessary; (6) enforceability of the judgment, if

obtained; (7) advantages and obstacles to a fair trial; (8) status of the court's trial calendar; and

(9) familiarity of forum with applicable state law. Boothroyd Dewhurst, Inc. v. Bd. of Trs. of the

Leland Stanford Junior Univ., Civ. A. No. 92-0075-P, 1993 WL 385713, at *7 (D.R.I. July 8,

1993).

Here, as Plaintiffs reside in Maine, and the majority of allegations occurred in Maine, this

action certainly could have been brought in the District of Maine. Similarly, Plaintiffs' choice of

forum "is not entitled to substantial weight in this matter because [Plaintiffs are] nonresident[s],

with no obvious connections to Rhode Island." Tristar Prods., Inc. v. Novel Brands, LLC, 267 F.

Supp. 3d 380, 383 (D.R.I. 2017) (transferring case where plaintiff was headquartered, and the

alleged acts occurred, in New Jersey); see McEvily v. Sunbeam-Oster Co., 878 F. Supp. 337,

ME1 29176585v.1

344 (D.R.I. 1994) (the burden of the party requesting transfer "is lightened when a plaintiff has not brought suit on his 'home turf' or at the site of the activities at issue in the law suit."). Further, as this action has no meaningful connection to Rhode Island, the balance of public and private factors weigh decisively in favor of the requested transfer.

    A.  <u>The District of Maine is the Most Convenient Forum.</u>

The first six factors, the most important being the convenience of witnesses, all weigh in favor of the requested transfer. <u>McEvily v. Sunbeam-Oster Co.</u>, 878 F. Supp. 337, 344–45 (D.R.I. 1994) ("The [witness] factor is not merely a consideration of the number of witnesses located in or near the respective forums, but the nature and quality of their testimony in relationship to the issues of the case") (citing <u>Houk v. Kimberly-Clark Corp.</u>, 613 F.Supp 923, 928 (W.D. MO. 1985)).

Adjudication of Plaintiffs' claims requires discovery and testimony related to: (1) Mr. West's work history; (2) sites where Mr. West alleges he was expose to asbestos; and (3) Mr. West's medical diagnosis, care and treatment.  All of these primarily occurred in Maine, under the supervision of Maine companies and Maine physicians, and none occurred in Rhode Island. Therefore, the majority of critical witnesses, documents and locations will likely be in Maine.[2] Additionally, Plaintiffs both reside in Maine, and there is no indication that they intend to move.

Although it may be necessary to conduct Rule 30(b)(6) depositions of certain Defendants' corporate witnesses, the majority of these witnesses are likely to be spread across the country, and there is no indication that a substantial number of corporate witnesses might be located in Rhode Island.  In any event, enforcing a potential judgment should not be materially more difficult in Maine than Rhode Island. Therefore, overall, the District of Maine would

---

[2] Although no witnesses have been formally identified by the Plaintiffs, there is no indication that any would be located in Rhode Island.

actually be *more* convenient for the Plaintiffs and any potential witnesses. This is exemplified by the fact that Mr. West's deposition took place in Bath, Maine, and not in Rhode Island where he has no connections.[3]

      B.  <u>Public Policy Factors Favor Adjudication in the District of Maine.</u>

There "is a local interest in having localized controversies decided at home." <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 509 (1947) ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."). Further, "jury duty is a burden that ought not be imposed upon the people of a community which has no relation to the litigation." <u>Id.</u> at 508-509. There is also an appropriateness "in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." <u>Id.</u> at 509. There is also an appropriateness "in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." <u>Id.</u> at 509

Here Plaintiff has demanded a jury trial for claims that relate directly to people, businesses, and locations within Maine. <u>See</u> Complaint. The jury's familiarity with the Maine area will likely be important. Conversely, it would be patently unfair to require the citizens and judiciary of Rhode Island to devote resources to adjudicating a case that has no connection to the state's community. Therefore, Maine's local interest in this case and its "concomitant fairness in having its citizens sit on a jury to decide it" favor transfer. <u>McEvily v. Sunbeam-Oster Co.</u>, 878 F.

---

[3] Plaintiff Merle West's deposition was taken over consecutive days:  November 27, 28, 29, 30, 2018 in Bath, Maine.

Supp. 337, 348 (D.R.I. 1994) (granting transfer and noting that plaintiff has tenuous connection with Rhode Island at best).

The District of Maine is also less congested than the District of Rhode Island. According to the Federal Judicial Caseload Statistics, in the calendar year ending March 31, 2018, there were 709 cases pending in the District of Rhode Island compared to the 433 cases pending in the District of Maine. See Exhibit C, Federal Judicial Caseload Statistics.[4] In the District of Rhode Island there were 230 civil cases per judgeship, as compared to 173 cases in the District of Maine. Id. Finally, the median time form filing to disposition in a civil case over a five-year period is 16.1 months in the District of Rhode Island compared to 7.3 months in the District of Maine. Id. Thus, Plaintiffs are actually more likely to obtain a speedier adjudication of their claims in the District of Maine.

## IV.    CONCLUSION

The factors for evaluating a 28 U.S.C. § 1404 request clearly weigh in favor of a transfer. Neither the Plaintiffs, nor their allegations, have any meaningful connections to Rhode Island. Indeed, by transferring this case, this Court will bring it closer to Plaintiffs' residence and the residence of expected witnesses, and will not prejudice Plaintiffs in any material manner. Consequently, it is not only a matter of convenience, but also in the interest of justice, that this case be litigated in the District of Maine where the alleged acts giving rise to this action occurred.

---

[4] https://www.uscourts.gov/statistics-reports/analysis-reports/federal-judicial-caseload-statistics

ME1 29176585v.1

**WHEREFORE,** for the foregoing reasons, Defendant, General Electric Company, respectfully requests that this Court transfer this action to the United States District Court for the District of Maine.

Dated: February 5, 2019                  THE DEFENDANT

                                          GENERAL ELECTRIC COMPANY
                                          By its Attorney,

                                          _/s/ Anne E. Shannon____
                                          Anne E. Shannon
                                          RI: # 9591
                                          McCarter & English LLP
                                          265 Franklin Street
                                          Boston, MA 02110
                                          617-449-6576
                                          AShannon@mccarter.com

7

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (none) on February 5, 2019

                                   /s/ Anne E. Shannon
                                 Anne E. Shannon

ME1 29176585v.1

# EXHIBIT A

**STATE OF RHODE ISLAND**                                    **SUPERIOR COURT**
**PROVIDENCE, SC**


**MERLE C. WEST and JANICE E. BRADFORD WEST,**
his wife,

    *Plaintiffs,*

    v.                                                    **CIVIL ACTION NO.:**

**AIR & LIQUID SYSTEMS CORPORATION,**
**AURORA PUMP COMPANY,**
**ARMSTRONG PUMPS, INC.,**
**ALBANY INTERNATIONAL, a Corporation,**
**ALLIED GLOVE CORPORATION,**
**BAYER CROPSCIENCE f/k/a Amchem PRODUCTS,**
**BELL & GOSSETT,**
**BSM PUMP CORP. formerly BROWN AND SHARPE,**
**CBS CORPORATION,**
**CRANE COMPANY,**
**DEZURIK, INC.,**
**EATON CORPORATION,**
**ECR INTERNATIONAL, as successor-in-interest to Utica Boiler Company,**
**FLOWSERVE CORPORATION,**
**FOSTER WHEELER , LLC,**
**VIACOM INC.,**
**GARDNER-DENVER, INC.,**
**GENERAL ELECTRIC COMPANY,**
**GOULD PUMPS,**
**GRINNELL, LLC,**
**HAMMOND VALVE COMPANY,**
**HONEYWELL INTERNATIONAL, INC.,**
**IMO INDUSTRIES, INC.,**
**INDUSTRIAL HOLDINGS CORPORATION f/k/a Carborundum Co.,**
**INGERSOLL-RAND COMPANY,**
**INTERNATIONAL PAPER CO.,**
**MAINE YANKEE ATOMIC POWER COMPANY,**
**METROPOLITAN LIFE INSURANCE COMPANY,**
**MILWAUKEE VALVE CO,**
**NEW ENGLAND INSULATION, INC.,**
**NEW YORKER BOILER COMPANY,**
**THE WM. POWELL COMPANY,**
**P.I.C. CONTRACTORS, INC.,**
**PACKINGS & INSULATIONS CORPORATION,**

1

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

00688 WES-LDA   Document 91   Filed 02/05/19   Page 13 of 158 PageID #: 4026

RAINBIRD CORPORATION,
KIMBERLY-CLARK CORPORATION,
     successor-in-interest to Scott Paper Company,
WARREN PUMPS,
PEERLESS PUMPS, INC.,
SAPPI FINE PAPER NORTH AMERICA,
     successor-in-interest to S. D. Warren Company,
SEARS ROEBUCK & COMPANY,
SID HARVEY INDUSTRIES, INC.,
     Successor-in-interest to Sid Harvey of New England, Inc.,
THE GAGE COMPANY,
TRANE COMPANY, successor-in-interest to American Standard, Inc.,
VELAN VALVE CORPORATION,
F. W. WEBB COMPANY,
WHEELER PROTECTIVE APPAREL, INC.,

     *Defendants.*

## COMPLAINT AND JURY DEMAND

1.    Plaintiffs Merle C. West and Janice E. West, his wife are individuals residing at 1098 West Alna Road, Alna, ME 04535.

2    Plaintiff Merle C. West worked as a boilermaker and machinist at Bath Iron Works from 1967 to 1972 and from 1978 to 1987; as a carpenter-millwright for Cianbro and for other contractors between 1988 and 1999 at various industrial sites.

3.    Defendant Air & Liquid Systems Corporation is the successor-in-interest to Buffalo Pumps, Inc. is a Delaware corporation with its principal place of business in Albany, New York and at all relevant times it did business in the States of Rhode Island and Maine.

4.    Defendant Aurora Pump Company is a North Carolina corporation with its principal place of business in Illinois and at all relevant times it did business in the State of Rhode Island and in the States of Rhode Island and Maine.

2

5. Defendant Armstrong Pumps, Inc. is a New York corporation with its principal place of business in the State of New York and at all times relevant did business in the States of Rhode Island and Maine.

6. Defendant Albany International, Inc. is a Delaware Corporation with its principal place of business in Albany, New York and at all times relevant did business in the States of Rhode Island and Maine.

7. Defendant Allied Glove Corporation is a Delaware corporation with its principal place of business located in Milwaukee, WI and at all times relevant did business in the State of Rhode Island and Maine.

8. Defendant Bayer Cropscience, Inc. is a Delaware corporation with its principal place of business in Pennsylvania and at all times relevant it did business in the States of Rhode Island and Maine.

9. Defendant Bell & Gossett is an Illinois corporation with its principal place of business in Morton Grove, Ill and at all times relevant did business in the States of Rhode Island Maine.

10. Defendant BSM Pump Corp, formerly Brown and Sharpe is a Rhode Island corporation with its principal place of business located in N. Kingstown, RI and at all times relevant also did business in the State of Maine.

11. Defendant CBS Corporation, n/k/a Viacom, Inc., is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of Rhode Island and Maine.

12. Defendant Crane Co. is a New Jersey corporation with its principal place of

3

business in New Jersey. At all relevant times it did business in the States of Rhode Island and Maine.

13.     Defendant DeZurik, Inc. is a Kansas corporation with its principal place of business located in Ellsworth, KS and at all times relevant did business in the States of Rhode Island and Maine.

14.     Defendant Eaton Corporation, successor-in-interest to Cutler-Hammer, Inc. is an Ohio corporation with its principal place of business located in Cleveland, Ohio and at all times relevant did business in the States of Rhode Island and Maine.

15.     Defendant ECR International is a New York corporation with its principal place of business in New York, is successor-in-interest to Utica Boiler Company and at all times relevant hereto did business in the State of Rhode Island and State of Maine.

16.     Defendant Flowserve Corporation, successor-in-interest to Durametallic is a Michigan corporation with its principal place of business located in Kalamazoo, MI and at all times relevant did business in the States of Rhode Island and Maine.

17.     Defendant Foster Wheeler, LLC is a New York corporation with  its principal place of business located in New Jersey and at all times relevant did business in the States of Rhode island and Maine.

18.     Defendant Gardner-Denver, Inc. is a Pennsylvania corporation with principal place of business located in Philadelphia, Pa. and at all times relevant did business in the States of Rhode Island and Maine.

19     Defendant General Electric Company is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of

4

Rhode Island and Maine.

20.    Defendant <u>Gould Pumps</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island and Maine.

21.    Defendant <u>Grinnell, LLC</u> is a Mississippi corporation with principal place of business located in Upper Saddle River, New Jersey and at all times relevant did business in the States of Maine and Rhode Island.

22.    Defendant <u>Hammond Valve Company</u> is a Wisconsin corporation with its principal place of business located in New Berlin, WI and at all times relevant did business in the States of Rhode Island and Maine.

23.    Defendant <u>Honeywell International, Inc.</u> is a Delaware corporation, having its principal place of business located in Pittsburgh, Pa. and is qualified to do business in the States of Rhode Island and Maine.

24.    The <u>Defendant, IMO Industries, Inc.</u>, f/k/a IMO Delaval, Inc., f/k/a Transamerica DeLaval, Inc., f/k/a DeLaval Turbine, Inc., DeValco Corporation is a corporation incorporated under the laws of the state of New York, having its principal place of business located in New York, and at all times relevant did business in the States of Rhode Island and Maine.

25.    Defendant <u>Industrial Holdings Corp.</u> successor-in-interest to Carborundum Company is a New York corporation with principal place of business located in New York and at all times relevant did business in the States of Rhode Island and Maine.

25.    Defendant <u>Ingersoll-Rand Co.</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island

5

and Maine.

26.     Defendant International Paper Company is a New York corporation with its principal place of business in Memphis, TN and at all relevant times did business in the States of Rhode Island and Maine.

27.     Defendant Maine Yankee Atomic Power Company is a Maine corporation with principal place of business located in Wiscasset, ME is successor-in-interest to Maine Yankee, Inc. and at all times relevant did business in the States of Maine and Rhode Island.

28.     Defendant Metropolitan Life Insurance Company is a mutual life insurance company of the State of New York with its principal place of business in the State of New York and at all relevant times it did business in the States of Rhode Island and Maine.

29.     Defendant Milwaukee Valve Co. is a Wisconsin corporation with principal place of business located in Madison, WI and at all times relevant did business in the States of Rhode Island and Maine.

30.     Defendant New England Insulation, Inc. is a Massachusetts corporation with its principal place of business located in Canton, Massachusetts and at all times relevant did business in the State of Rhode Island and Maine.

31     Defendant New Yorker Boiler Company is a Pennsylvania corporation with its principal place of business located in Hatfield, Pa. and at all relevant times did business in the States of Maine and Rhode Island.

32.     Defendant P.I.C. Contractors, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island. At all relevant times it did business in the States of Rhode Island and Maine.

33.     Defendant Packings and Insulations Corporation is a Rhode Island corporation

6

with its principal place of business in Rhode Island and at all relevant times it did business in the States of Rhode Island and Maine.

34.     Defendant Rainbird Corporation is a California corporation with principal place of business located in Azsa, CA, is successor-in-interest to Hammond Valve Company and at all times relevant did business in the States of Rhode Island and Maine.

35.     Defendant Kimberly-Clark Corporation is a Delaware corporation with its principal place of business located in Irving, TX and at all relevant times did business in the States of Rhode Island and Maine.

36.     Defendant Peerless Pumps, Inc. is a Delaware corporation with principal place of business located in Indianapolis, IN and at all times relevant did business in the State of Rhode Island and State of Maine.

37.     Defendant Sappi Fine Paper North America is the successor-in-interest to S. D. Warren Paper is a Delaware Corporation with principal place of business located in Pennsylvania and at all times relevant did business in the State of Rhode Island and State of Maine.

38.     Defendant Warren Pumps is a Massachusetts corporation with its principal place of business in Massachusetts and. at all relevant times it did business in the States of Rhode Island and Maine.

39.     Defendant Sears Roebuck & Company is a New York corporation with its principal place of business in Chicago, and at all times relevant did business in the State of Rhode Island and State of Maine.

40.     Defendant Sid Harvey Industries, Inc., successor-in-interest to Sid Harvey of New England, Inc. is a New York corporation with its principal place of business in Garden City, NY

7

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

00688 WES-LDA   Document 91   Filed 02/05/19   Page 19 of 158 PageID #: 4032

and at all times material relevant did business in the State of Rhode Island and Maine.

41.     Defendant The Gage Company is a Pennsylvania corporation with its principal place of business located in Portland, ME and at all times relevant did business in the States of Rhode Island and Maine.

42.     Defendant Trane Company, successor-in-interest to American Standard, Inc. is a Delaware corporation with principal place of business located in Michigan and at all times relevant did business in the State of Rhode Island and State of Maine.

43.     The Defendant, Velan Valve Corporation, is a corporation incorporated under the laws of the State of New York, with its principal place of business located in the State of Vermont and all times relevant did business in the States of Rhode Island and Maine.

44.     The Defendant F. W. Webb Company is a Massachusetts corporation with principal offices located in Bedford, MA and at all times relevant did business in the State of Maine and State of Rhode Island.

45.     Defendant Wheeler Protective Apparel, Inc., is a New Hampshire corporation with principal place of business located in the State of Illinois and at all times relevant did business in the States of Rhode Island and Maine

## COUNT I

46.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

47.     Defendants mined, processed, manufactured, designed, supplied, delivered, and sold asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so, at all times relevant herein.

8

Case 1:18-cv-00688-WES-LDA   Document 91   Filed 02/05/19   Page 20 of 158 PageID #: 4033

48.     While at work, Plaintiff was caused to inhale, absorb, ingest, and come into contact with asbestos and asbestos-containing products mined, processed, manufactured, designed, supplied, delivered, and/or sold by Defendants.

49.     The Defendants were negligent in that they each, jointly and severally:

      a.     mined, processed, manufactured, designed, supplied, delivered, and/or sold asbestos and asbestos-containing products, and/or knowingly gave substantial assistance or encouragement to those who did so, that they knew, or reasonably should have known, were dangerous, defective, poisonous, and harmful to an individual's health, body, and life;

      b.     failed to reasonably warn Plaintiff of the harmful effects of exposure to asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so;

      c.     failed to provide Plaintiff with the knowledge as to possible precautions to protect against the harmful effects of asbestos exposure and/or knowingly gave substantial assistance or encouragement to those who did so; and,

      d.     were otherwise negligent.

50.     As a direct and proximate result of the negligence of the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

51.     As a direct and proximate result of the negligence of the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

9

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT II

52.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

53.     At all relevant times, the Defendants, as part of their regular business, mined, processed, manufactured, designed, supplied, delivered, and sold and/or knowingly gave substantial assistance or encouragement to those who did so, asbestos and asbestos-containing products and put them into the stream of commerce in a defective, unsafe, and inherently dangerous condition, and failed to provide reasonable warnings.

54.     The asbestos and asbestos-containing products were expected to, and did reach such persons, including Plaintiff, without substantial change in the condition in which they were sold and/or supplied.

55.     At all relevant times, the asbestos and asbestos-containing products were used and employed for the purposes for which they were mined, processed, manufactured, designed, supplied, delivered, sold, and intended to be used and in a manner foreseeable to the Defendants.

56.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and required medical monitoring.

10

57. As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-spouse has suffered, and will continue to suffer, great pain and suffering, mental anguish, a loss of society, consortium, companionship, support, dependency and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT III

### JANICE E. BRADFORD WEST v. DEFENDANTS

58. Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

59. The Defendants expressly and impliedly warranted that the asbestos and asbestos-containing products that they mined, processed, manufactured, designed, supplied, delivered, and sold were fit for use, were merchantable, and were reasonably safe for the purpose intended.

60. The Defendants breached their warranty in that the asbestos and asbestos-containing products were defective, unsafe, unreasonably dangerous, ultra-hazardous, and unsuitable for the purpose intended.

61. As a direct and proximate result of the breach by the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, required medical monitoring, was otherwise damaged.

11

Case 1:18-cv-00688-WES-LDA   Document 91   Filed 02/05/19   Page 23 of 158 PageID #: 4036

62.     As a direct and proximate result of the breach by the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

### COUNT IV

63.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

64.     The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

12

## COUNT V

### AGAINST INTERNATIONAL PAPER COMPANY,
### KIMBERLY-CLARK CORPORATION;
### SAPPI FINE PAPER NORTH AMERICA; and
### MAINE YANKEE ATOMIC POWER COMPANY

65.     The condition of Plaintiff is a direct and proximate result of the negligence of the Defendants, both jointly and severally, in that as premise owners, owned and/or operated premises that were unsafe due to a latent hazardous condition, i.e. transportable, respirable asbestos dust and fibers, as follows:

a.      The Defendants knew that asbestos was present in their mills;

b.      The Defendants failed to advise Plaintiff and/or his employer that he might encounter asbestos in the form of block insulation, pipe covering, gaskets, packing, and other forms during the course of his working at the premises;

c.      The Defendants failed to advise Plaintiff and/or his employer that protective equipment should be utilized when working in areas in which asbestos could be encountered;

d.      The Defendants failed to maintain their premises in a reasonably safe condition and/or properly mark those areas in which asbestos in its' various forms could be encountered;

e.      The Defendants failed to test and properly identify where asbestos could be encountered within their mill, prior to business invitees such as Plaintiff coming onto the premises to perform work; and

f.      The Defendants are negligent for otherwise failing to comply with the applicable State and Federal laws and standards for protecting a business invitee such as Plaintiff.

WEHREFORE Plaintiffs demand damages of Defendants, jointly and severally, plus interest, costs and whatever other further relief this Honorable Court deems right and just.

13

## COUNT VI

66.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

67.     Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs.

68.     The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

69.     The Defendants acted in the following fashion:

a.      Metropolitan Life Insurance Company (Met Life) required a tangible quid pro quo from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners.   The study revealed asbestos miners suffered from asbestosis.  The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

b.      In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of his study shows that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

14

      c.     Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

      d.     In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to

15

suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

e.   On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall) Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company,) Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f.   At this November 11, 1948 meeting, these defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g.   At this meeting, the defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These defendants thereby fraudulently misrepresented the risks of

16

asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

h.      As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the <u>Archives of Industrial Hygiene and Occupational Medicine</u> (Vol. 3, No. 1), a journal of the American Medical Association.    The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs).  Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work.  The defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

i.      Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

j.      The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):   Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos).  The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the A.M.A. 's

17

Archives of Industrial Hygiene and Industrial Medicine in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

k.      Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l.      This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m.      As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Dr. Kenneth W. Smith, Dr. Paul Cartier, Dr. Arthur J. Vorwald, Dr. Anthony J. Lanza, Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. Government officials, Canadian government

18

officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

n.     Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A that asbestosis did increase a worker's chances of incurring lung cancer.

o.     The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

p.     By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q.     In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

r.     The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk

19

associated with asbestos inhalation.

s.       In 1967, the Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.       In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

u.       At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

v.       The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex) Johns-Manville, and others.

w.       In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that

20

asbestos-containing products offered no hazard to workers who used these products.

x.     The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

y.     In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable.     Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

z.     In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products.     National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

aa.     In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D. caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results

21

of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

      bb.    In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

      cc.    In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

      dd.    In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

      ee.    In 1970, through their agents, Defendants The Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

      ff.    All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza,

22

M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

70.    All defendants:

a.    did a tortious act in concert with the other or pursuant to a common design with them; and/or

b.    knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

c.    gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

71.    The acts of the defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

a.    The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

b.    Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

i.    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

23

       ii.     assist in the continued pecuniary gain of the defendants through the sale of their products;

       iii.    influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

       iv.    to provide a defense in lawsuits brought for injury resulting from asbestos disease.

    c.    Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

    d.    Defendants individually, as members of a conspiracy, and as agents of each other intended that Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to these products.

    e.    Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

24

    f.    Plaintiffs suffered and will continue to suffer injury as a direct and proximate result of the acts alleged herein.

72.    As a direct and proximate result of the acts of the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged.

## COUNT VII

### JANICE E. BRADFORD WEST V. ALL DEFENDANTS

73.    As a direct and proximate result of the acts of the Defendants, Plaintiff-spouse has been damaged as follows:

    a.    Plaintiff has been and will continue to be deprived of the services, society and companionship of her husband;

    b.    Plaintiff has been required to spend money for medicine, medical care, nursing, hospital and surgical attention, medical appliances, and household care for the treatment of her husband;

    c.    Plaintiff has been and may be deprived of the household contribution of her husband; loss of pension and social security benefits.

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

Plaintiffs hereby demand a trial by jury.

By their attorneys,

*/s/ Vincent L. Greene*
Robert J. McConnell, Esq. (#3888)
Vincent L. Greene, Esq. (#5971)
***MOTLEY RICE LLC***
55 Cedar Street
Suite 100
Providence, RI  02903
401-457-7700
401-457-7708 Fax

Providence, RI

Dated:  August. 31, 2018

26

# EXHIBIT B

VOLUME 1
PAGES: 1-279
EXHIBITS: 1-8

STATE OF RHODE ISLAND

PROVIDENCE, SS.          SUPERIOR COURT DEPT.
                        OF THE TRIAL COURT
                        NO. 18-6293

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
MERLE C. WEST and JANICE E.         *
BRADFORD WEST,                      *
      Plaintiffs,                   *
                                    *
vs.                                 *
                                    *
AIR & LIQUID SYSTEMS CORPORATION,   *
et al,                              *
      Defendants.                   *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


EVIDENTIARY AUDIOVISUAL DEPOSITION OF MERLE C. WEST
             Tuesday, November 27, 2018
             Residence Inn by Marriott
              139 Richardson Street
                  Bath, Maine


     Darlene Caiazzo Sousa, CSR, LCR NH #139, RPR
          EPPLEY COURT REPORTING, LLC
               Post Office Box 382
          Hopedale, Massachusetts 01747
       508.478.9795   508.478.0595 (Fax)
            www.eppleycourtreporting.com

Merle West                    Volume 1                    November 27, 2018

12

1     BY MR. CIRILANO:

2          Q.   Good morning, Merle.   How are you?

3          A.   Good.

4          Q.   Would you please introduce yourself?

5          A.   Merle Clarence West.

6          Q.   And what is your address, Merle?

7          A.   1098 West Alna Road, Alna, Maine,

8     04535.

9          Q.   And how old are you today?

10         A.   70.

11         Q.   And it is correct that you have been

12    diagnosed with mesothelioma; is that true?

13         A.   Yes.

14         Q.   Can you please walk us through how you

15    came to be diagnosed with mesothelioma?   How

16    did that happen?

17         A.   First of May --

18              MR. SUGARMAN:   I apologize.   For those

19    on the phone, just remember we're creating a

20    video record, so if you could please put your

21    phones on mute -- we're hearing some loud

22    typing -- it would be appreciated.   Thanks.

23         Q.   Please continue.

24         A.   The first of May the wife and I

Merle West                    Volume 1                November 27, 2018

13

```
1    decided to take a trip to go to Las Vegas to
2    get a rent-a-car, go to Utah, Arizona and look
3    at Bryce and Zion, places like that.
4    Escalante-Staircase and the national parks out
5    there.  Went to Mesa Verde, some of the other
6    mesas.  We made a good two weeks of it.  While
7    I was on that trip, I kept getting these little
8    pains, you know, nuisance pains.  And I didn't
9    know what they were.  So I said, well, when I
10   get back, I'll go see the doctor.  So when I
11   got back, the first thing I did was went and
12   seen my doctor.
13        Q.   Who is that doctor?
14        A.   Dr. --
15        Q.   Romac?
16        A.   Dr. Michael Romac of Wiscasset.  We
17   started out simple to figure out what it was
18   and nothing seemed to be working, so I
19   eventually ended up getting a biopsy to confirm
20   exactly what I had, and that was what I had.
21   And I had biphasic mesothelioma.
22        Q.   Okay.  Now, Dr. Romac, he had you
23   undergo some diagnostic tests at Miles
24   Memorial; is that right?
```

Merle West                          Volume 1                November 27, 2018

14

1          A.   That was one place, yes.

2          Q.   And he didn't like what he saw; is

3      that true?

4          A.   Right.

5          Q.   Okay.  I think that you had to have

6      some fluid removed; is that true?

7          A.   Yes.  Dr. MacDonald at Mid Coast

8      removed that.

9          Q.   Okay.  And how did they go about

10     removing that fluid?

11         A.   Put a hole in the side and suck it

12     out.

13         Q.   And was that a difficult or painful

14     procedure?

15         A.   It was not a picnic.

16         Q.   Okay.  And do you know how much fluid

17     they drained when they drained fluid?

18         A.   From the looks of it, it was, I would

19     say, around 20, 22 ounces.

20         Q.   Okay.  And did they have this sent out

21     to be tested or looked at?

22         A.   Yes.

23         Q.   And do you know the results of that,

24     those tests on the fluid?

```
 1           A.  It was inconclusive.
 2           Q.  Okay.  Now, when you were seeing Dr.
 3    Romac and you said Dr. MacDonald, and you've
 4    seen some other physicians for your
 5    mesothelioma; is that true?
 6           A.  Yes.
 7           Q.  Have any of those physicians told you
 8    what they believe the cause of your
 9    mesothelioma was?
10           A.  Yes.  I went to a surgeon in Augusta
11    who did a biopsy, and he said it would just be
12    a small cut.  And when he got done, through, it
13    was a big cut.  So asked him why, and he says,
14    I didn't like what I saw, because your tumors
15    are so thick.  And anyway, the biopsy come
16    back, and went back to see him.  He gave me the
17    results which was biphasic.
18           Q.  That was Dr. Blank?
19           A.  Dr. Seth Blank.
20           Q.  That biopsy, was that a difficult or
21    painful process, procedure?
22           A.  It still is.  I still can feel that
23    even now.  It's like somebody got a -- grab
24    ahold of my side, pulling on it like it's a big
```

Merle West                     Volume 1                  November 27, 2018

16

1    knot there, yanking on.

2         Q.   Okay.   I don't know if you told me.

3    Did they tell you what the cause of

4    mesothelioma was, what they thought brought it

5    about?

6         A.   They want to know if I ever worked in

7    a shipyard.

8         Q.   Okay.   And you told them yes?

9         A.   Yeah.

10        Q.   Did they ask you about your asbestos

11   exposure anywhere?

12        A.   Yes.

13        Q.   Okay.   Now, you were -- once they

14   determined that you had mesothelioma, what

15   treatment did they decide should be undertaken

16   initially?  How did they start to treat it?

17        A.   He didn't recommend any treatment.  He

18   just recommended I go back to Dr. MacDonald who

19   then recommended me to a Dr. Haney in Topsham.

20   And I talked to him, and then he recommended to

21   Dr. Haney that I go to Dana-Farber and Brigham

22   and Women's for a second opinion.

23        Q.   You wanted to get a second opinion?

24        A.   Yes.

**Merle West**                    **Volume 1**           **November 27, 2018**

17

1       Q.  Did you go and get that second

2   opinion?

3       A.  I did.

4       Q.  Where did you go?

5       A.  I went to Dana-Farber.  Dana-Farber,

6   it was the chemotherapy.  We were at Brigham

7   and Women's; it was surgery.

8       Q.  Okay.  Do you recall the doctors you

9   saw at Brigham and Women's and at Dana-Farber?

10      A.  Dana-Farber was Dr. Kiel or Kiel.  And

11  Brigham and Women's was Dr. Lebenthal.

12      Q.  Okay.  Now, what did those physicians

13  decide should be done in terms of treatment

14  initially?  What were their initial

15  suggestions?

16      A.  Dr. Kiel was about almost exactly the

17  same as Dr. Haney was.

18      Q.  Which was chemotherapy?

19      A.  Which was chemotherapy.

20      Q.  Okay.

21      A.  And that was interested in

22  immunotherapy more so, and that's like playing

23  politics.  So they would only do that if

24  chemotherapy failed, which it did.

18

```
 1          Q.   Okay.
 2          A.   So then I went to Dr. Lebenthal.  They
 3    decided, because I was in such good physical
 4    condition, I was never on any medication, and I
 5    had never done drugs or smoked and I wasn't an
 6    alcoholic or anything, that I was a very good
 7    candidate.  So I went through about three weeks
 8    of traveling to Boston ever other day.
 9          Q.   They were planning on having you
10    undergo surgery; is that what you're telling
11    us?
12          A.   Yes.
13          Q.   I'm sorry.  Continue on?
14          A.   I went through an array of tests,
15    poking and digging and biopsies, and everything
16    was coming out great.  The last thing they
17    pulled was an MRI which showed the cancer had
18    gone into my bones.
19          Q.   I'm sorry, Merle.  I'm going to be
20    asking a lot of difficult questions today.  If
21    you ever need to stop to regain your composure,
22    everybody understands that.  It's a very
23    difficult situation for you.  I'm very sorry.
24    Let us know if you want to take a brief break.
```

1       built at BIW.  Then there was the Gridley, the

2       Reeves, the Worden and England, the Dale, the

3       Turner, the Halsey.

4                  MR. CIRILANO:  Did you need him to

5       repeat any of those?

6                  THE COURT REPORTER:  No.

7            Q.  Let me ask you first:  How did you

8       come up with this list?

9            A.  A lot of it is by memory, and, of

10      course, I also have a BIW book that lists new

11      ships.  And I also had a book that lists all

12      ships.  I don't have it anymore.

13           Q.  Okay.  You looked through a list of

14      ships and those that rang a bell to you, you --

15           A.  I went through what I had for what I

16      kept for information.

17           Q.  Okay.

18           A.  That's overhaul.  That's only up until

19      '72.

20           Q.  We'll talk about -- I know you went

21      back to Bath Iron Works a couple of times

22      anyway, and we'll talk about it in chronology.

23           A.  Okay.

24           Q.  Okay.  Your first job at BIW when you

Merle West                 Volume 1              November 27, 2018

1      began in '67 was a boilermaker; is that right?

2          A.   That's what they started me off as.

3          Q.   How long did you perform the job of

4      boilermaker roughly?

5          A.   I think it was in the area of about

6      maybe six months.  It was two months, at least.

7      I'm thinking more like six months.

8          Q.   Okay.  What type of work were you

9      doing as a boilermaker for BIW?

10         A.   Assembling new boilers in the boiler

11     shop and as well as on board ship.

12         Q.   Okay.

13         A.   You put these together in increments.

14         Q.   Do you know how many boilers you would

15     have built during that time?  That's five?

16         A.   Probably I worked on four boilers.

17         Q.   Do you know the name of any of the

18     ships where you built the boiler that was

19     installed, any of those ships where you recall

20     actually building and installing that boiler?

21         A.   I believe it was the first two German

22     ships, the Lutjens and the Molders.

23         Q.   Now, do you know the manufacturer of

24     the boilers that you were constructing or

Merle West                    Volume 1              November 27, 2018

56

```
1    whereas if you worked in a paper factory, paper
2    mill you didn't do much machining.
3         Q.  Got you.  Now, did you stay employed
4    as an outside machinist until you left Bath
5    that first time in 1972?
6         A.  Repeat.
7         Q.  Once you became an outside machinist,
8    did you stay as an outside machinist until you
9    left there in '72?
10        A.  Yes.
11        Q.  What type of work would you perform as
12   an outside machinist for BIW initially?  We'll
13   talk about the new construction on those German
14   destroyers, I guess, and then on the container
15   ships that were overhauled.  So let me ask you
16   first:  The Lutjens, the Molders, the Rommel
17   the, Seawitch, the Lightning and the Stag
18   Hound, those are all new construction?
19        A.  Right.
20        Q.  The remainder of the ships on that
21   list are overhaul?
22        A.  Right.
23        Q.  Now, let me see if I can short-circuit
24   a little bit of the information that you're
```

Merle West                    Volume 1                 November 27, 2018

126

1        Q.   In order --

2        A.   If things got real bad, you could use

3    equal to or better than material-wise, but they

4    didn't like to do that.

5        Q.   In your experience as an outside

6    machinist, most of the packing --

7        A.   You couldn't buy that stuff unless you

8    went to the tech manual, and you could only buy

9    what was given you information from the

10   manufacturer.

11       Q.   Okay.

12       A.   They quite often -- they didn't even

13   give you the sizes of the material.  Like

14   packing, they say 3/8 square, inch and a half

15   ID, 2-inch OD or something.  They didn't do

16   that.  They wouldn't give you -- they just say

17   packing, and that's what you got, packing.  And

18   that packing was specifically for that pump.

19   So that may have been changed, but it was the

20   same packing supplied by the same company.

21       Q.   Got you.  I think you told me that

22   wasn't absolutely true with respect to valves?

23       A.   Not always, especially smaller valves,

24   lesser valves.

Merle West                 Volume 1                November 27, 2018

130

```
 1          Q.  Yes.
 2          A.  -- it created a lot of dust, and we
 3     were never supplied any respirators or
 4     anything, no safety devices, nothing.
 5          Q.  Understood.  Now, you stopped working
 6     at Bath Iron Works this first time on, I
 7     believe, June 2, '72.  Does that sound about
 8     right?
 9          A.  Yes.
10          Q.  Okay.  And then I think you began to
11     work as a carpenter for a gentleman by the name
12     of Myron Long; is that right?
13          A.  Yes.  He worked at SUPSHIP.  He was
14     also an Alna resident and friend.
15          Q.  How long did you work for Mr. Long?
16          A.  About a year and a month.
17          Q.  Okay.  Why did you stop working for
18     Mr. Long?
19          A.  I had a motorcycle accident.
20          Q.  Was that work with him mostly
21     commercial or residential or both?
22          A.  Residential.
23          Q.  What kind of -- did you do -- what
24     kind of work did you do for Mr. Long?
```

Merle West                    Volume 1                November 27, 2018

131

1        A.   Just about every phase.

2        Q.   All carpentry?

3        A.   I even laid cement block for him for

4    cellars, everything.

5        Q.   Do you think you were exposed to any

6    asbestos working as carpenter for Mr. Long?

7        A.   It would be very little, I would

8    think.  Some sheetrock, working with mortar.

9        Q.   Okay.  Now, after your employment with

10   Mr. Long ended, you went back to work for BIW;

11   is that correct?

12       A.   I did that winter for recuperation.

13       Q.   Okay.  And I think that the BIW

14   records indicate that you went back on 9/24/73;

15   is that right?

16       A.   It sounds right.

17       Q.   I think you stayed until 5/17 of '74

18   if the records are accurate.  Does that sound

19   about right?

20       A.   It does.

21       Q.   Now, during that time I think you told

22   me that you were doing planning and scheduling?

23       A.   Yes.

24       Q.   What is planning and scheduling?  What

Merle West                    Volume 1              November 27, 2018

136

1          Q.   Now, you leave BIW in May of '74.
2     Were you laid off, I understand; is that right?
3          A.   Yes.
4          Q.   And is that when you went to build
5     your home?
6          A.   Yes.
7          Q.   Okay.  So in the fall of '74, you're
8     building your home.  Are you also working for a
9     gentleman by the name of Pete Pratt?
10         A.   He came to my house and wanted to hire
11    me.
12         Q.   Okay.  He saw you building your house.
13         A.   Yes.  Well, he was a contractor
14    working in the area, and he knew of me.
15         Q.   Did you go to work would for him?
16         A.   Yes.
17         Q.   I think you worked for him until
18    spring or so of '76?
19         A.   Two winters, I think.
20         Q.   I'm sorry?
21         A.   I think I worked through two winters.
22    That would have been about right.
23         Q.   Okay.  Is this commercial or
24    residential or both?

1          Q.   Okay.  You eventually go back to Bath
2     Iron Works in 1978, true?
3          A.   Yes.
4          Q.   And how many homes do you think you
5     built prior to returning to Bath in '78?
6          A.   In those couple of years?
7          Q.   Yes.
8          A.   Three.
9          Q.   Do you think you --
10         A.   Anyways.
11         Q.   Did you work with any
12    asbestos-containing products building those
13    homes?
14         A.   Not knowingly.
15         Q.   Okay.  Let's go back to -- let's talk
16    about your work at BIW.  According to your
17    records there, you get back on 1/11/78.  Does
18    that sound about right?
19         A.   Yes.
20         Q.   And then you work during that stint
21    until 2/8/88.  Does that sound about right?
22         A.   Exactly.
23         Q.   Okay.  When you returned to work in
24    '78, are you returning to work at BIW as an

Merle West                    Volume 1                  November 27, 2018

152

1        A.   The Brown, the Maui which was a new
2    ship, a Danish ship.   All these are overhaul.
3    The Capodanno, the Cannole, the Pharris, Sims,
4    Conyngham the Trippe, Vreeland, McDonnell,
5    Brumby, Page, King, Paul, Patterson,
6    Montgomery, Capodanno, and the Page.
7        Q.   Okay.   These ships but for the Maui
8    were overhaul?
9        A.   Yes.
10       Q.   Okay.   Did you work on any turbines as
11   an outside machinist during this period?   Let
12   me ask a simpler way.   For a period of time
13   starting in '78, you were back as an outside
14   machinist; is that right?
15       A.   Right.
16       Q.   Would your work as an outside
17   machinist during this '78 to '88 time period be
18   any different than it was -- and you've
19   explained to us what an outside machinist does
20   from that '67 to '72 time period -- or was the
21   job pretty much the same?
22       A.   The first nine months of this I worked
23   the same.
24       Q.   Okay.   And then as you become your

154

```
 1    when you're an outside machinist, the turbine
 2    work that you described previously, same type
 3    of work going on?
 4        A.   The first nine months was same type.
 5        Q.   How about that first nine months
 6    boiler, same work as an outside machinist on
 7    boilers during this nine-month period as it was
 8    when you --
 9        A.   Same.
10        Q.   Okay.  Were the manufacturers of the
11    turbines during this '78 time period the same
12    as those during the '67 to '72 time period?
13             DEFENSE COUNSEL:  Objection.  Form.
14        A.   Same.
15        Q.   Okay.  You told us before about how
16    your work on pumps and valves brought you in
17    contact with gaskets and packing on pumps and
18    pumps and valves.  Does that same hold true for
19    this nine months as an outside machinist
20    beginning in '78?
21             DEFENSE COUNSEL:  Objection.  Form.
22        A.   Yes.
23        Q.   Were the manufacturers of the pumps
24    and valves during this stint the same as the
```

1          Q.   Okay.   A lot of overtime?

2          A.   There was a lot of overtime.

3          Q.   Now, so you're aboard the ship.

4     You're in the shop, and is this the same shop

5     we were talking about before?

6          A.   Machine shop.

7          Q.   Okay.   And you're in the office.

8     Where is your office located at this time?

9          A.   It was across the train tracks.

10         Q.   Okay.

11         A.   Just tracks that ran up -- it was a

12    cross in an office building on the other side.

13    It was close by.

14         Q.   Now, on an average day I know you

15    worked overtime so we're talking about more

16    than an eight-hour day, but whatever the amount

17    of hours during a typical day, how would it

18    break down between office, aboard whatever

19    vessel is being overhauled and in the shop?

20    How many --

21         A.   Well, some days I'd be down the shop

22    almost all day.   Then the next day I'd be up in

23    the office almost all day writing it up and

24    doing research.   So I would say probably in the

Merle West                    Volume 1            November 27, 2018

165

1          Q.  Right.

2          A.  Especially the turbines because that

3     was my -- I was the only one that handled them,

4     the main propulsion.

5          Q.  Would you have worked -- would you

6     have supervised the work being done on boilers?

7          A.  No.

8          Q.  Okay.

9          A.  We had another person that took care

10    of that.

11         Q.  Okay.  Would you be in the fireroom

12    when boilers were being overhauled?

13         A.  Oh, yes, because a lot of the

14    equipment, the pumps and stuff like that was in

15    the fireroom as well.

16         Q.  Okay.  Your job was to oversee the

17    work being done on pumps and valves?

18         A.  Pumps and valves and anything

19    mechanical and also like I say, I did a lot of

20    main steampiping.

21         Q.  Okay.

22         A.  Level one.

23         Q.  Okay.  I'm going to move on from BIW

24    to your work for Cianbro, okay.  And I believe

1    that you began to work for Cianbro in roughly

2    1988 or so?

3        A.  Yes.

4        Q.  What is Cianbro?  First of all, who

5    are they?

6        A.  It's -- they're mostly a general

7    construction company.  They happen to be

8    building bridges.  They have to be going in as

9    a subcontractor to a nuclear station like Maine

10   Yankee.  They built bridges here in Portland.

11       Q.  And you worked for them?

12       A.  They work a lot in paper mills.

13       Q.  Okay.

14       A.  About any kind of construction job

15   they'd take.

16       Q.  Okay.

17       A.  And they're based out of Pittsfield,

18   Maine.

19       Q.  Now, you worked for them as a

20   millwright?

21       A.  Yes.

22       Q.  Okay.  And I think you worked from '88

23   until about '95.  Does that sound about right?

24       A.  Yes.  And they're nonunion so just

211

1    mill in the state of New York?

2         A.   Yes.

3         Q.   Do you know where in New York that was

4    located?

5         A.   Ticonderoga.

6         Q.   Do you know the name of that?

7         A.   IP.

8         Q.   That stands for?

9         A.   International Paper.

10        Q.   How many times did you work there?

11        A.   Once.

12        Q.   Do you know what you did there?

13        A.   Boiler work.

14        Q.   How long did that job last, any idea

15   roughly?

16        A.   Four days, give or take.

17        Q.   Okay.  Do you recall what you were

18   doing on the boiler?

19        A.   Freeing up doors.

20        Q.   Okay.

21        A.   On the bottom.

22        Q.   Did that work expose you to any

23   asbestos-containing products?

24        A.   Working in it all the time.

Merle West                    Volume 1                  November 27, 2018

213

1         A.   It's burning garbage dump, I guess.

2         Q.   Power station?

3         A.   Yeah, it's a power station.  It runs

4    like a -- runs one turbine and one generator.

5         Q.   What were you doing there for Cianbro?

6         A.   There was one huge pump that we were

7    working on.

8         Q.   Do you know who made that pump?

9         A.   Aurora.

10        Q.   Aurora.  What type of work were you

11   doing on the Aurora Pump at this Merrimack

12   Waste Recovery in Massachusetts?

13        A.   Bearings and packing.

14        Q.   Okay.  Is this the same type of

15   packing that you were describing for us

16   previously that you would be using on pumps?

17        A.   Except it was big.

18        Q.   Okay.  Much bigger.

19             Do you know who manufactured the

20   packing that was used on the Aurora Pump?

21        A.   That was John Crane, I'm pretty sure.

22        Q.   Okay.

23        A.   Because we received that in a big John

24   Crane box.

Merle West                    Volume 1                November 27, 2018

216

1   jobsite?  Did that overlap?

2         A.   Such as Maine Yankee, yes.

3         Q.   I'm asking you that Maine Yankee was

4   one?

5         A.   Yes, such as.

6         Q.   Do you recall who you were working for

7   at Maine Yankee?

8         A.   Local 1996.

9         Q.   Okay.  We're going to get to that.

10        A.   I was working for the union which

11  would be probably Burns and Roe at the time.

12        Q.   Okay.  I guess when we start talking

13  about the Local 1996 work we'll get to that, so

14  I'll reserve that question for a little bit

15  later okay.

16        A.   All right.

17        Q.   Now, the rest of the jobs that we're

18  going to talk about concern when you were a

19  member of Local 1996.  What trades were

20  represented by Local 1996?

21        A.   Carpenters and millwrights.

22        Q.   And did you work for 1996 as a

23  carpenter, a millwright or both?

24        A.   Both.

235

1    to go off the record again to change the tape.

2              (Recess 2:59 p.m. to 2:59 p.m.)

3              THE VIDEOGRAPHER:   On the record.

4         Q.   I think the next one we were going to

5    talk about is Sappi paper mill in Westbrook for

6    one day, 7/23/98.   And I think you told me you

7    weren't sure about what that job was all about

8    anymore.   Still hasn't come to you?

9         A.   Had to be a very minor job.

10        Q.   Okay.   There's an entry for Seabrook,

11   New Hampshire is the next one, 8/17/98 to

12   8/19/98.   Do you recall what facility that

13   might have been in Seabrook?

14        A.   That's the first time Seabrook's come

15   up, right?

16        Q.   I think so.

17        A.   Went down there, got some training.

18   And they deleted the job.   I was down there for

19   two days for training, and they did not do the

20   job.

21        Q.   Okay.   No exposure, I take it?

22        A.   No exposure, just training.

23        Q.   Next job I have is a Holt Hall in

24   Portland, 8/24/98 to 9/11/98.   Do you think you

VOLUME 2
PAGES: 280-629
EXHIBITS: None

STATE OF RHODE ISLAND

PROVIDENCE, SS.          SUPERIOR COURT DEPT.
                        OF THE TRIAL COURT
                        NO. 18-6293


* * * * * * * * * * * * * * * * * * * * * * * * * * * * *
MERLE C. WEST and JANICE E.           *
BRADFORD WEST,                        *
     Plaintiffs,                      *
                                      *
                                      *
vs.                                   *
                                      *
AIR & LIQUID SYSTEMS CORPORATION,     *
et al,                                *
     Defendants.                      *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *




   CONTINUED EVIDENTIARY AUDIOVISUAL DEPOSITION
             OF MERLE C. WEST
        Wednesday, November 28, 2018
          Residence Inn by Marriott
           139 Richardson Street
              Bath, Maine


   Darlene Caiazzo Sousa, CSR, LCR NH #139, RPR
        EPPLEY COURT REPORTING, LLC
            Post Office Box 382
        Hopedale, Massachusetts 01747
      508.478.9795   508.478.0595 (Fax)
        www.eppleycourtreporting.com

304

1    up because there like little knobs on the side,

2    so they would fit up against the bracket.

3        Q.   Like little burrs?

4        A.   Yeah.  You take a file and just clean

5    them off.

6        Q.   Do you have any way to estimate how

7    often it was you had to do that?

8        A.   Usually every time you put them on.

9        Q.   Okay.  How long would that take per

10   lining, a few seconds?

11       A.   A minute just to run the file across

12   and get those burrs off.

13       Q.   Do you have any knowledge as to

14   whether or not your uncle's junkyard is still

15   in existence even if it's owned by somebody

16   else?

17       A.   No.  He pretty much closed it around

18   '78.

19       Q.   Okay.  What town was it located in?

20       A.   1978 was when he closed it.

21       Q.   What town was that again?

22       A.   Wiscasset.

23       Q.   And do you know whether or not the

24   barn is still standing or not?

341

1    a lot of questions that I otherwise would have

2    covered.  So I want to kind of skip around

3    starting first with the work at the junkyard,

4    okay?  You were there, you said, starting in

5    around 1964 or '65.  Were you still in high

6    school at that time, or had you graduated?

7         A.  High school.

8         Q.  Okay.  Did you graduate from high

9    school?

10        A.  '66.

11        Q.  Okay.  And what high school did you

12   graduate from?

13        A.  Wiscasset.

14        Q.  While you -- when you started at the

15   junkyard in '64 or '65, you were still a

16   student, true?

17        A.  Yes.

18        Q.  And then you started at Bath Iron

19   Works for your first stint on October 16, 1967;

20   is that accurate?

21        A.  Sounds right.

22        Q.  Okay.  And when you started at Bath

23   Iron Works in 1967, you are working there

24   full-time; is that true?

Merle West                  Volume 2                  November 28, 2018

342

1    A.  Yes.

2    Q.  Okay.  So did there come a point once

3    you started at Bath Iron Works where you worked

4    fewer hours at the junkyard because you were

5    full-time at Bath?

6    A.  I worked -- no, I don't think so

7    because I worked the weekends and after work

8    and stuff at the junkyard.

9    Q.  Okay.

10   A.  Like I say, it was my uncle's

11   business, and it was like being home at the

12   family.

13   Q.  Did you have regular hours, or did you

14   just go in as on an as-needed basis?

15   A.  I went in as needed or when I wanted

16   to, either way.

17   Q.  Were there times when you would go in,

18   and there was no work for you to do?

19   A.  There was always work.  Yes, always

20   work.

21   Q.  So there were times when you would go

22   on your own, and they then there were times

23   when your uncle would call you and tell you he

24   needed you for a job?

Merle West                  Volume 2                  November 28, 2018

373

1  home, would you have done that brake job
2  outside?
3       A.  Outside.
4       Q.  Where were you living at that time in
5  the '66 to '71 time frame?
6       A.  Wiscasset.
7       Q.  Were you living at home?
8       A.  Rummerill Road.
9       Q.  When you and your wife were married in
10 1967, where did you live?
11      A.  Rummerill Road.
12      Q.  She lived --
13      A.  Wiscasset.
14      Q.  Did she live with you at your family
15 home?
16      A.  No, I had a place of my own.
17      Q.  Okay.
18      A.  Yeah.  We had a place of our own.
19      Q.  On the same property?
20      A.  Yes.
21      Q.  Just so I understand, how long did you
22 live there with your wife, your first wife?
23      A.  I lived in Wiscasset until about 1972,
24 and then I moved to Alna where I am now.

Merle West                     Volume 2                November 28, 2018

374

1        Q.   You were on Rummerill --

2        A.   Road.

3        Q.   -- Road?

4        A.   Close enough.

5        Q.   -- until 1972, and then you moved to

6     Alna?

7        A.   Yes.

8        Q.   You mentioned the 1969 Dodge Charger,

9     and you already testified about the work you

10    did on that vehicle when Attorney Sugarman was

11    asking you questions.  And is it your testimony

12    that you went to the NAPA store that Karl

13    Pearson owned for that?

14       A.   I believe, if my memory serves me

15    right where I bought material for that car.  I

16    did a lot of work to it.

17       Q.   The only other one that I have is the

18    '79 Chevy half-ton, and you described that

19    brake work just a short while ago.  And you

20    believe that you purchased the replacement

21    brakes for that vehicle from NAPA?

22       A.   Yeah.  Those were first-time

23    replacements.

24       Q.   Okay.

Merle West                 Volume 2                November 28, 2018

1    been totally enclosed, but they was in some

2    sort of a wooden structure.

3         Q.   What was in a wooden structure?

4         A.   The valves.

5         Q.   Let's turn to gaskets.  The gaskets

6    that were used in the shipyard were placed in a

7    warehouse and unboxed before they went to the

8    stockroom at Bath Iron Works; isn't that true?

9         A.   I don't know.

10        Q.   How about the pipecovering?  The

11   pipecovering in the stockroom was unboxed;

12   isn't that correct?

13        A.   I didn't work there.  I don't know.

14        Q.   Did you ever see any boxes of

15   pipecovering aboard a ship while you worked at

16   Bath Iron Works between 1967 and 1972?

17        A.   Yes.  Cardboard boxes.

18        Q.   Did you ever see a warning stamped on

19   the box indicating that the product contained

20   asbestos.  It could -- and want you to avoid

21   breathing the dust, and if it could not be

22   avoided, wear a mask approved by the Bureau of

23   Mines?

24        A.   I don't recall seeing any warnings of

Merle West                    Volume 2                November 28, 2018

1        Q.   Right.

2        A.   You call that maintaining.

3        Q.   And you talked about that in some

4    detail yesterday, right?

5        A.   Uh-huh.

6        Q.   Was most of your work as an outside

7    machinist in that 1967 to 1972, right, that was

8    when you were an outside machinist, '67 to '72?

9        A.   Yes.

10       Q.   Was most of your work as an outside

11   machinist in that time frame, was it repairing

12   and maintaining the equipment, or was it

13   installing and removing the equipment?

14       A.   It depends on the time frame.  At the

15   beginning it was installing because I was

16   working on new ships.

17       Q.   Right.

18       A.   And then as I got going I went on to a

19   container ship for a year, and then I went on

20   to overhaul which was repairing.

21       Q.   Got it.  And in that '67 to '72 time

22   frame, when did that shift from the kind of new

23   construction installing duty to more of a

24   maintenance or repair duty?

451

1    to do what -- we installed our own equipment.

2         Q.   And when you were doing welding as you

3    just described, were you using welding gloves

4    specifically for welding?

5         A.   Some were welding gloves, and we used

6    the asbestos gloves as well.

7         Q.   Okay.

8         A.   The asbestos gloves were usually more

9    handy because we kept those in our tool boxes

10   as a rule because we used them so much.

11        Q.   Yesterday you talked about mittens,

12   asbestos mittens.  Would you use asbestos

13   mittens for welding?

14        A.   If they was in the toolbox, that's

15   what you used rather than trying to chase down

16   welding gloves.  Everything at BIW was if you

17   could find it, you steel it, you got it.  But

18   otherwise you didn't have it, so you kept stuff

19   in your toolbox locked up.

20        Q.   Of the overall work you did as an

21   outside machinist at Bath Iron Works between

22   1967 and 1972, how much -- what percentage of

23   your work required you to use heat-protective

24   gloves?

Merle West                  Volume 2                November 28, 2018

1          A.   Somewhere between 35, 40 percent

2     because of the repairs you was doing so many

3     bearing replacements and things like that as

4     compared to new.

5          Q.   So is it also -- would you say then

6     the same percentage of your work in that time

7     period were the hot jobs that you've talked

8     about yesterday a little bit?

9          A.   Yeah.  Yes.

10         Q.   Now, even for a hot job, would you

11    agree with me that you would only be wearing

12    any kind of heat-resistant or heat-protective

13    mittens for part of that job?

14         A.   I'm not sure I catch the drift.

15         Q.   Well, you gave an example yesterday of

16    replacing bearings, and you started talking a

17    little bit about that today.  From the

18    beginning to the end of the job of replacing

19    bearings, are you wearing protective gloves the

20    entire time from the beginning of that job to

21    the end of that job, or are you putting the

22    gloves on?

23         A.   On and off, on and off.

24         Q.   On and off?

Merle West                    Volume 2              November 28, 2018

579

1   roadmap, I'm going to ask you some general

2   questions about Cianbro and work with the union

3   and then specifically walk through the visits

4   you made to the International Paper facility in

5   Jay, Maine, and also one in Ticonderoga, New

6   York.

7        A.  Okay.

8        Q.  At Cianbro did you have any sort of a

9   permanent supervisor, or did it just depend on

10  whatever the job was there was a foreman or

11  supervisor on-site from Cianbro?

12       A.  Ed Jay was -- I worked both Cianbro

13  and union, Ed Jay.

14       Q.  For the work at Jay with Cianbro, did

15  you have a foreman on-site from Cianbro?

16       A.  Yes.

17       Q.  Okay.  Was that the general way that

18  Cianbro worked?  You would have a foreman

19  on-site from Cianbro at the jobs?

20       A.  Yes.  And Jay people coordinated with

21  the foreman of Cianbro on what the work they

22  wanted done.

23       Q.  So --

24       A.  With me working for Cianbro, I dealt

1   wouldn't supply the safety equipment.  So

2   that's how that works.

3        Q.  That's -- you're referring to your

4   experience at Maine Yankee?

5        A.  Yes.  Working for Cianbro.

6        Q.  I'll move on to the specific site

7   visits.  So I'm going to start with

8   Ticonderoga.  You mentioned -- you testified

9   yesterday that you went to Ticonderoga one

10  time, correct?

11       A.  One.

12       Q.  Do you recall anything about the plant

13  there, anything that stuck out in your mind

14  about the plant at Ticonderoga?

15       A.  It was on the water, big plant.

16       Q.  It was on the river?

17       A.  Champlain.

18       Q.  Do you know what season it was when

19  you were there?  I only ask because I don't see

20  anything about when it was.

21       A.  I'm thinking around June.  It's got to

22  be on here.

23       MR. CIRILANO:  Is this for 1996 you're

24  asking, Joel, or is this --

627

```
 1        A.   I do not know.
 2        Q.   Okay.  Last questions.  These are on a
 3   totally different topic.  Have you ever lived
 4   in Rhode Island?
 5        A.   I have stayed in Rhode Island but not
 6   lived there.
 7        Q.   Okay.  Have you ever paid taxes in
 8   Rhode Island?
 9        A.   In Rhode Island?
10        Q.   Not sales tax, but --
11        A.   I don't even belong to mafia.
12        Q.   Have you ever -- have you received any
13   of your medical treatment in Rhode Island?
14        A.   Just for my daughter.
15        Q.   Understood.  Have you ever done work
16   in Rhode Island?
17        A.   No.
18        Q.   Not for your daughter?
19        A.   No.
20        Q.   All right.
21             MR. FYKE:  I may have some cleanup
22   questions, but for now that's all I have.
23   Thank you for your time.
24             THE WITNESS:  Okay.
```

VOLUME 3
PAGES: 630-972
EXHIBITS: 9-16

STATE OF RHODE ISLAND

PROVIDENCE, SS.                SUPERIOR COURT DEPT.
                              OF THE TRIAL COURT
                              NO. 18-6293

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
MERLE C. WEST and JANICE E.          *
BRADFORD WEST,                       *
     Plaintiffs,                     *
                                     *
                                     *
vs.                                  *
                                     *
AIR & LIQUID SYSTEMS CORPORATION,    *
et al,                               *
     Defendants.                     *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


CONTINUED EVIDENTIARY AUDIOVISUAL DEPOSITION
          OF MERLE C. WEST
       Thursday, November 29, 2018
        Residence Inn by Marriott
         139 Richardson Street
              Bath, Maine


Darlene Caiazzo Sousa, CSR, LCR NH #139, RPR
     EPPLEY COURT REPORTING, LLC
          Post Office Box 382
     Hopedale, Massachusetts 01747
    508.478.9795   508.478.0595 (Fax)
      www.eppleycourtreporting.com

1      Q.   And during those two weeks, you were
2  primarily working around the number 10 paper
3  machine; am I understanding that correctly?
4      A.   Yes.
5      Q.   Same question for that location that I
6  have for Bath Iron Works, the pipe insulation
7  at that location, right now do you recall the
8  manufacturer of it?
9      A.   No.
10     Q.   Moving on to Maine Yankee, I know you
11 worked there multiple times, but right now I'm
12 just going to focus on your time at Maine
13 Yankee when you were employed by Cianbro from
14 '88 to '95.  My recollection is that you worked
15 there six different times within that time
16 period?
17     A.   That's approximate.
18     Q.   Okay.
19     A.   But sometimes I'd be there for a week
20 or two weeks, and sometimes I'd be there for
21 two or three months.
22     Q.   Okay.  And that was going to be my
23 next question, if you could recall the specific
24 amount of time you were there for each of those

Merle West                  Volume 3              November 29, 2018

657

1   approximately six times?

2        A.   I'd probably can give you a good idea

3   if I went down this piece by piece but...

4        Q.   Some of them were about one week, and

5   others may have been longer, two or three

6   months?

7        A.   It would come -- it would amount up to

8   probably over a year, over 2,000 hours.

9        Q.   I think you said on the first day of

10  your deposition that Maine Yankee was

11  constructed in around 1970 or 1971?

12       A.   I think that's about when it was

13  completed.

14       Q.   And so the first time you worked there

15  was about 18 years later, right, if we're

16  talking '88?

17       A.   Sounds right.

18       Q.   Okay.  So are you able to -- the

19  insulation on the pipes at Maine Yankee, you

20  can't tell me when that insulation was

21  installed on those pipes, correct?

22       A.   It had to be installed at that time

23  frame when they completed it on operation.

24       Q.   When you say "at that time frame,"

664

1    building.

2         Q.  Okay.

3         A.  Mostly going to school in the office

4    building, gone through security.  They also had

5    a place up there for showers, if you got

6    contaminated down in the plant.

7         Q.  I'm going to try to put all the other

8    jobsites together and ask these questions.  And

9    if we can't do it that way, then I'll break it

10   up by jobsite just to short-circuit this.  So

11   including jobsites that you worked at while you

12   were at Cianbro, so International Paper at Jay,

13   the Otis mill, Georgia-Pacific, then I'm also

14   going to add in wherever you worked during your

15   union job including at Madison Paper and

16   Seabrook.  For any location that you worked at

17   in your career, do you know the manufacturer of

18   the pipe insulation?

19        A.  No.

20        Q.  And yesterday you testified that you

21   recalled the names Johns Manville and Kaylo; is

22   that correct?

23        A.  That's the two of them, yes.

24        Q.  Okay.  And you said that's two of

```
                                  VOLUME 4
                                  PAGES: 973-1186
                                  EXHIBITS: 17-18G
```

STATE OF RHODE ISLAND

PROVIDENCE, SS.            SUPERIOR COURT DEPT.
                          OF THE TRIAL COURT
                          NO. 18-6293


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MERLE C. WEST and JANICE E.        \*
BRADFORD WEST,                     \*
     Plaintiffs,                   \*
                                   \*
vs.                                \*
                                   \*
AIR & LIQUID SYSTEMS CORPORATION,  \*
et al,                             \*
     Defendants.                   \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



     CONTINUED EVIDENTIARY AUDIOVISUAL DEPOSITION
               OF MERLE C. WEST
          Friday, November 30, 2018
          Residence Inn by Marriott
            139 Richardson Street
                 Bath, Maine


     Darlene Caiazzo Sousa, CSR, LCR NH #139, RPR
          EPPLEY COURT REPORTING, LLC
               Post Office Box 382
          Hopedale, Massachusetts 01747
        508.478.9795   508.478.0595 (Fax)
            www.eppleycourtreporting.com

1077

1    were employed by Cianbro, you worked at an S.D.

2    Warren paper mill in Westbrook; is that right?

3         A.   Yes.

4         Q.   Okay.  And then later when you were

5    employed by the union, you worked at a Sappi

6    paper mill in Westbrook; is that right?

7         A.   The same mill, yes.

8         Q.   That was my next question.  Those were

9    one and the same, right?

10        A.   Yes.

11        Q.   Okay.  And at that mill, same question

12   as before, you were hired by a contractor who

13   was hired by the paper mill owner, correct?

14        A.   Same sequence.

15        Q.   And as your employer, the contractor

16   would pay you; is that right?

17        A.   Yes.

18        Q.   And you'd never received a paycheck

19   from the owner of the paper mill itself, right?

20        A.   Right.

21        Q.   Okay.  Did you have a foreman at the

22   Westbrook mill?

23        A.   Certainly.

24        Q.   And he would have been employed by the

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MERLE C. WEST and
JANICE E. BRADFORD WEST  )  CIVIL ACTION NO.:
          )
      Plaintiffs, )
  v.         )
           )
AIR & LIQUID SYSTEMS   )
CORPORATION, et al.    )
           )
      Defendants. )
_____)

## NOTICE OF REMOVAL

**TO THE CHIEF JUDGE AND JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND:**

Pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446(b)(3), Defendant General Electric
Company ("GE"), by and through undersigned counsel, hereby removes the above-captioned
civil action which was filed in the Providence County Superior Court, State of Rhode Island,
Civil Action PC 18-6293, to the United States District Court for the District of Rhode Island and
gives notice of such removal. In support thereof, GE offers the following:

## I.  INTRODUCTION

1. Plaintiff Merle C. West and Janice E. Bradford West, filed this lawsuit on September 5,
   2018, entitled Merle C. West and Janice E. Bradford West, Case No. 18-6293, against GE,
   and numerous other defendants in the Superior Court of Rhode Island, Providence
   County. *See* Complaint attached hereto as Exhibit A.

2. GE was served with the Complaint on or about September 7, 2018. *See* Summons and
   Proofs of Service, attached hereto as Exhibit B and Exhibit C.

3. In the Complaint, Plaintiffs allege that Merle C. West was exposed to asbestos-containing products through, inter alia, his work at the Bath Iron Works shipyard in Maine. Exhibit A, ¶ 2. Plaintiffs did not identify or reference products that allegedly exposed Merle C. West to asbestos in the Complaint. *See* Exhibit A.

4. This action may be removed to this court pursuant to 28 U.S.C. §1441(a), which allows a defendant or defendants to remove any civil action brought in a state court over which the District Courts of the United States have original jurisdiction, to the District of the United States for the district and division embracing the place where such action is pending.

5. Removal is timely under 28 U.S.C. § 1446(b)(3). This Notice of Removal is filed within thirty (30) days of Plaintiffs' service of supplemental discovery responses and exhibits on November 20, 2018, which for the first time, specifically identified the U.S. Navy ships that he alleges exposed him to asbestos during his employment at Bath Iron Works and establishes the federal contractor defense. GE designed, manufactured, and supplied turbines and related propulsion and power generation equipment to the U.S. Navy for use aboard navy ships and nuclear submarines. Each of these turbines was custom- designed and manufactured in accordance with detailed specifications and/or regulations promulgated or adopted by the Navy and its officers, and each relevant aspect of the turbine's design and manufacture was subject to detailed and ongoing direction and control by the Navy through its individual officers.

6. It was not until Plaintiffs' service of his supplemental discovery responses and exhibits which were filed on November 20, 2018 that it first became ascertained to GE that the case was removable.

## II.    GROUNDS FOR REMOVAL

7.    Pursuant to §1442(a)(1), removal is appropriate where the moving party can (1) demonstrate that it acted under the direction for a federal office, (2) raise a colorable federal defense to plaintiff's claim, and (3) demonstrate a casual nexus between plaintiff's claims and acts it performed under color of federal office. See <u>Mesa v. California,</u> 489 U.S. 121, 124-25, 129-31, 134-35 (1989)

8.    The basis for this removal is that this action involves a person, *i.e.,* GE, who- in relation to the claims being stated against it and as summarized herein- acted under the authority, direction and control of an officer or agency of the United States for purposes of 28 U.S.C. §1442(a)(1) and who can state at least a colorable federal law-based "governmental contractor" defense to those claims. See <u>Mesa v. California,</u> 489 U.S. 121, 124-25, 129-31, 134-35 (1989)

9.    The Notice of Removal is filed within thirty (30) days after receipt by the GE of Plaintiffs' supplemental interrogatory responses and exhibits which established the federal contractor defense. 28 U.S.C. §§ 1446(b)(3); 1442(a)(1).

10.   Plaintiffs are alleging asbestos exposure from the products GE supplied to the U.S. Navy for use on U.S. Navy ships and/or nuclear submarines. In the manufacture and sale of turbines and associated equipment for the U.S. Navy, including all aspects of warning associated with those turbines and equipment, GE was acting under and at the direction of the U.S. Navy. GE designed, manufactured, and supplied turbines and other equipment at issue in this case to the U.S. Navy in accordance with precise, detailed, specifications promulgated by the U.S. Navy. Turbines were subject to various test and trials supervised

by the Navy before they were approved for use on military vessels. All relevant aspects of the design and manufacture of the turbines were subject to close, detailed and ongoing supervision and control of the Navy. As such GE acted under the detailed and ongoing direction and control of one or more federal officers. Federal jurisdiction exists in this case pursuant to federal contractor defense. 28 U.S.C. § 1442(a)(1).

11. Should Plaintiffs file a motion to remand this case, GE respectfully requests an opportunity to respond more fully in writing, but offers the following statement and citations to authority at this time in satisfaction of its obligation under 28 U.S.C. §1446 to provide a short and plain statement of the legal and factual basis for its removal.

12. GE has a colorable federal-law defense to this action. See Boyle v. United Technologies Corp., 487 U.S. 500, 504 (1988) (holding government contractors have immunity from liability for injuries arising from any exposure to asbestos related equipment on board Navy vessels, insofar as they were constructed or repaired by the contractor); In re Joint E. and S.D.N.Y. Asbestos Litigation ("Grispo"), 897 F.2d 626, 630 (2d Cir. 1990) (recognizing applicability of government contractor defense in failure-to-warn case); Faddish v. General Electric Co., 2010 U.S. Dist. LEXIS 112937 (E.D. Pa. October 22, 2010) (granting summary judgment to GE based upon the government contractor defense in an asbestos failure-to-warn case).

13. This situation has arisen in Shepherd v. Air & Liquid Sys. Corp., 2012 WL 5874781 (D.R.I. Nov. 20, 2012). In Shepherd, the Defendants sought removal after the Plaintiff's discovery responses indicated that Plaintiff worked with asbestos-containing products in the boiler rooms of Naval ships. The defendants asserted that federal officer removal was appropriate because they manufactured boilers pursuant to contracts with the navy. After

removal, the plaintiff's moved to remand the case. The U.S. District Court District of Rhode Island found that removal was appropriate because the defendants established a colorable federal defense to Plaintiffs' claims and that the requirements for federal officer removal were satisfied.

## III.     ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED

14. This Notice of Removal is being filed in the District of Rhode Island, the District Court of the United States for the district and division within which the state court action is pending as required by §§ 1441(a) and 1446(a).

15. Pursuant to 28 U.S. C. § 1446(d), a copy of the Notice of Removal and Notice of Filing of Notice of Removal will be provided to Plaintiff and filed with the Clerk of the County Superior Court of Providence, Rhode Island, in the form attached hereto and will file those documents required by Local Rule 81. See Exhibit D.

16.  By filing this Notice of Removal, GE does not waive any defenses or rights that may be available to them.

17. This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure, as required by 28 U.S.C. §1446(a).

## VI.     CONCLUSION

Wherefore, GE respectfully request that this action be duly removed from the Superior Court for the County of Providence to this Court, and that it proceed herein.

DEFENDANT,
GENERAL ELECTRIC COMPANY,

Dated:  December 19, 2018

/s/ Anne E. Shannon
Anne E. Shannon
RI Bar #9591
MCCARTER & ENGLISH, LLP.
265 Franklin Street
Boston, MA 02110
Phone: 617-449-6500

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that the foregoing document was electronically filed with the Rhode

Island Superior Court and a copy was sent to all counsel of record via File & ServeXpress on this

19th day of December, 2018.  The document electronically filed and served is available for

viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.


       <u>Anne E. Shannon</u>
       Anne E. Shannon

# EXHIBIT A

**STATE OF RHODE ISLAND**               **SUPERIOR COURT**
**PROVIDENCE, SC**


**MERLE C. WEST and JANICE E. BRADFORD WEST,**
**his wife,**

     *Plaintiffs,*


     **v.**                        **CIVIL ACTION NO.:**

**AIR & LIQUID SYSTEMS CORPORATION,**
**AURORA PUMP COMPANY,**
**ARMSTRONG PUMPS, INC.,**
**ALBANY INTERNATIONAL, a Corporation,**
**ALLIED GLOVE CORPORATION,**
**BAYER CROPSCIENCE f/k/a Amchem PRODUCTS,**
**BELL & GOSSETT,**
**BSM PUMP CORP. formerly BROWN AND SHARPE,**
**CBS CORPORATION,**
**CRANE COMPANY,**
**DEZURIK, INC.,**
**EATON CORPORATION,**
**ECR INTERNATIONAL, as successor-in-interest to Utica Boiler Company,**
**FLOWSERVE CORPORATION,**
**FOSTER WHEELER , LLC,**
**VIACOM INC.,**
**GARDNER-DENVER, INC.,**
**GENERAL ELECTRIC COMPANY,**
**GOULD PUMPS,**
**GRINNELL, LLC,**
**HAMMOND VALVE COMPANY,**
**HONEYWELL INTERNATIONAL, INC.,**
**IMO INDUSTRIES, INC.,**
**INDUSTRIAL HOLDINGS CORPORATION f/k/a Carborundum Co.,**
**INGERSOLL-RAND COMPANY,**
**INTERNATIONAL PAPER CO.,**
**MAINE YANKEE ATOMIC POWER COMPANY,**
**METROPOLITAN LIFE INSURANCE COMPANY,**
**MILWAUKEE VALVE CO,**
**NEW ENGLAND INSULATION, INC.,**
**NEW YORKER BOILER COMPANY,**
**THE WM. POWELL COMPANY,**
**P.I.C. CONTRACTORS, INC.,**
**PACKINGS & INSULATIONS CORPORATION,**

1

RAINBIRD CORPORATION,
KIMBERLY-CLARK CORPORATION,
    successor-in-interest to Scott Paper Company,
WARREN PUMPS,
PEERLESS PUMPS, INC.,
SAPPI FINE PAPER NORTH AMERICA,
    successor-in-interest to S. D. Warren Company,
SEARS ROEBUCK & COMPANY,
SID HARVEY INDUSTRIES, INC.,
    Successor-in-interest to Sid Harvey of New England, Inc.,
THE GAGE COMPANY,
TRANE COMPANY, successor-in-interest to American Standard, Inc.,
VELAN VALVE CORPORATION,
F. W. WEBB COMPANY,
WHEELER PROTECTIVE APPAREL, INC.,

    *Defendants*.

## COMPLAINT AND JURY DEMAND

1.     Plaintiffs Merle C. West and Janice E. West, his wife are individuals residing at 1098 West Alna Road, Alna, ME 04535.

2     Plaintiff Merle C. West worked as a boilermaker and machinist at Bath Iron Works from 1967 to 1972 and from 1978 to 1987; as a carpenter-millwright for Cianbro and for other contractors between 1988 and 1999 at various industrial sites.

3.     Defendant Air & Liquid Systems Corporation is the successor-in-interest to Buffalo Pumps, Inc. is a Delaware corporation with its principal place of business in Albany, New York and at all relevant times it did business in the States of Rhode Island and Maine.

4.     Defendant Aurora Pump Company is a North Carolina corporation with its principal place of business in Illinois and at all relevant times it did business in the State of Rhode Island and in the States of Rhode Island and Maine.

5.      <u>Defendant Armstrong Pumps, Inc.</u> is a New York corporation with its principal place of business in the State of New York and at all times relevant did business in the States of Rhode Island and Maine.

6.      <u>Defendant Albany International, Inc.</u> is a Delaware Corporation with its principal place of business in Albany, New York and at all times relevant did business in the States of Rhode Island and Maine.

7.      <u>Defendant Allied Glove Corporation</u> is a Delaware corporation with its principal place of business located in Milwaukee, WI and at all times relevant did business in the State of Rhode Island and Maine.

8.      Defendant <u>Bayer Cropscience, Inc,</u> is a Delaware corporation with its principal place of business in Pennsylvania and at all times relevant it did business in the States of Rhode Island and Maine.

9.      <u>Defendant Bell & Gossett</u> is an Illinois corporation with its principal place of business in Morton Grove, Ill and at all times relevant did business in the States of Rhode Island Maine.

10.     <u>Defendant BSM Pump Corp</u>, formerly Brown and Sharpe is a Rhode Island corporation with its principal place of business located in N. Kingstown, RI and at all times relevant also did business in the State of Maine.


11.     Defendant <u>CBS Corporation, n/k/a Viacom, Inc.,</u> is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of Rhode Island and Maine.

12.     Defendant <u>Crane Co.</u> is a New Jersey corporation with its principal place of

3

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/3/2018 1:08:06 PM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:19-cv-00286-WES-LDA Document 11-1 Filed 02/13/19 Page 96 of 137 PageID #: 1209

business in New Jersey. At all relevant times it did business in the States of Rhode Island and Maine.

13.     Defendant DeZurik, Inc. is a Kansas corporation with its principal place of business located in Ellsworth, KS and at all times relevant did business in the States of Rhode Island and Maine.

14.     Defendant Eaton Corporation, successor-in-interest to Cutler-Hammer, Inc. is an Ohio corporation with its principal place of business located in Cleveland, Ohio and at all times relevant did business in the States of Rhode Island and Maine.

15.     Defendant ECR International is a New York corporation with its principal place of business in New York, is successor-in-interest to Utica Boiler Company and at all times relevant hereto did business in the State of Rhode Island and State of Maine.

16.     Defendant Flowserve Corporation, successor-in-interest to Durametallic is a Michigan corporation with its principal place of business located in Kalamazoo, MI and at all times relevant did business in the States of Rhode Island and Maine.

17.     Defendant Foster Wheeler, LLC is a New York corporation with its principal place of business located in New Jersey and at all times relevant did business in the States of Rhode island and Maine.

18.     Defendant Gardner-Denver, Inc. is a Pennsylvania corporation with principal place of business located in Philadelphia, Pa. and at all times relevant did business in the States of Rhode Island and Maine.

19      Defendant General Electric Company is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of

4

Rhode Island and Maine.

20.     Defendant <u>Gould Pumps</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island and Maine.

21.     Defendant <u>Grinnell, LLC</u> is a Mississippi corporation with principal place of business located in Upper Saddle River, New Jersey and at all times relevant did business in the States of Maine and Rhode Island.

22.     Defendant <u>Hammond Valve Company</u> is a Wisconsin corporation with its principal place of business located in New Berlin, WI and at all times relevant did business in the States of Rhode Island and Maine.

23.     Defendant <u>Honeywell International, Inc</u>. is a Delaware corporation, having its principal place of business located in Pittsburgh, Pa. and is qualified to do business in the States of Rhode Island and Maine.

24.     The Defendant, <u>IMO Industries, Inc.</u>, f/k/a IMO Delaval, Inc., f/k/a Transamerica DeLaval, Inc., f/k/a DeLaval Turbine, Inc., DeValco Corporation is a corporation incorporated under the laws of the state of New York, having its principal place of business located in New York, and at all times relevant did business in the States of Rhode Island and Maine.


25.     Defendant <u>Industrial Holdings Corp</u>. successor-in-interest to Carborundum Company is a New York corporation with principal place of business located in New York and at all times relevant did business in the States of Rhode Island and Maine.

25.     Defendant <u>Ingersoll-Rand Co.</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island

5

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/3/2018 3:01:44 PM
Envelope: 1693607
Reviewer: Lynn G.

and Maine.

26.     Defendant International Paper Company is a New York corporation with its principal place of business in Memphis, TN and at all relevant times did business in the States of Rhode Island and Maine.

27.     Defendant Maine Yankee Atomic Power Company is a Maine corporation with principal place of business located in Wiscasset, ME is successor-in-interest to Maine Yankee, Inc. and at all times relevant did business in the States of Maine and Rhode Island.

28.     Defendant Metropolitan Life Insurance Company is a mutual life insurance company of the State of New York with its principal place of business in the State of New York and at all relevant times it did business in the States of Rhode Island and Maine.

29.     Defendant Milwaukee Valve Co. is a Wisconsin corporation with principal place of business located in Madison, WI and at all times relevant did business in the States of Rhode Island and Maine.

30.     Defendant New England Insulation, Inc. is a Massachusetts corporation with its principal place of business located in Canton, Massachusetts and at all times relevant did business in the State of Rhode Island and Maine.

31      Defendant New Yorker Boiler Company is a Pennsylvania corporation with its principal place of business located in Hatfield, Pa. and at all times relevant did business in the States of Maine and Rhode Island.

32.     Defendant P.I.C. Contractors, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island.  At all relevant times it did business in the States of Rhode Island and Maine.

33.     Defendant Packings and Insulations Corporation is a Rhode Island corporation

6

with its principal place of business in Rhode Island and at all relevant times it did business in the States of Rhode Island and Maine.

34.   Defendant Rainbird Corporation is a California corporation with principal place of business located in Azsa, CA, is successor-in-interest to Hammond Valve Company and at all times relevant did business in the States of Rhode Island and Maine.

35.   Defendant Kimberly-Clark Corporation is a Delaware corporation with its principal place of business located in Irving, TX and at all relevant times did business in the States of Rhode Island and Maine.

36.   Defendant Peerless Pumps, Inc. is a Delaware corporation with principal place of business located in Indianapolis, IN and at all times relevant did business in the State of Rhode Island and State of Maine.

37.   Defendant Sappi Fine Paper North America is the successor-in-interest to S. D. Warren Paper is a Delaware Corporation with principal place of business located in Pennsylvania and at all times relevant did business in the State of Rhode Island and State of Maine.

38.   Defendant Warren Pumps is a Massachusetts corporation with its principal place of business in Massachusetts and. at all relevant times it did business in the States of Rhode Island and Maine.

39.   Defendant Sears Roebuck & Company is a New York corporation with its principal place of business in Chicago, and at all times relevant did business in the State of Rhode Island and State of Maine.

40.   Defendant Sid Harvey Industries, Inc., successor-in-interest to Sid Harvey of New England, Inc. is a New York corporation with its principal place of business in Garden City, NY

7

and at all times material relevant did business in the State of Rhode Island and Maine.

41.     Defendant The Gage Company is a Pennsylvania corporation with its principal place of business located in Portland, ME and at all times relevant did business in the States of Rhode Island and Maine.

42.     Defendant Trane Company, successor-in-interest to American Standard, Inc. is a Delaware corporation with principal place of business located in Michigan and at all times relevant did business in the State of Rhode Island and State of Maine.

43.     The Defendant, Velan Valve Corporation, is a corporation incorporated under the laws of the State of New York, with its principal place of business located in the State of Vermont and all times relevant did business in the States of Rhode Island and Maine.

44.     The Defendant F. W. Webb Company is a Massachusetts corporation with principal offices located in Bedford, MA and at all times relevant did business in the State of Maine and State of Rhode Island.

45.     Defendant Wheeler Protective Apparel, Inc., is a New Hampshire corporation with principal place of business located in the State of Illinois and at all times relevant did business in the States of Rhode Island and Maine

## COUNT I

46.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

47.     Defendants mined, processed, manufactured, designed, supplied, delivered, and sold asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so, at all times relevant herein.

8

48.     While at work, Plaintiff was caused to inhale, absorb, ingest, and come into contact with asbestos and asbestos-containing products mined, processed, manufactured, designed, supplied, delivered, and/or sold by Defendants.

49.     The Defendants were negligent in that they each, jointly and severally:

a.     mined, processed, manufactured, designed, supplied, delivered, and/or sold asbestos and asbestos-containing products, and/or knowingly gave substantial assistance or encouragement to those who did so, that they knew, or reasonably should have known, were dangerous, defective, poisonous, and harmful to an individual's health, body, and life;

b.     failed to reasonably warn Plaintiff of the harmful effects of exposure to asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so;

c.     failed to provide Plaintiff with the knowledge as to possible precautions to protect against the harmful effects of asbestos exposure and/or knowingly gave substantial assistance or encouragement to those who did so; and,

d.     were otherwise negligent.

50.     As a direct and proximate result of the negligence of the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

51.     As a direct and proximate result of the negligence of the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT II

52.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

53.     At all relevant times, the Defendants, as part of their regular business, mined, processed, manufactured, designed, supplied, delivered, and sold and/or knowingly gave substantial assistance or encouragement to those who did so, asbestos and asbestos-containing products and put them into the stream of commerce in a defective, unsafe, and inherently dangerous condition, and failed to provide reasonable warnings.

54.     The asbestos and asbestos-containing products were expected to, and did reach such persons, including Plaintiff, without substantial change in the condition in which they were sold and/or supplied.

55.     At all relevant times, the asbestos and asbestos-containing products were used and employed for the purposes for which they were mined, processed, manufactured, designed, supplied, delivered, sold, and intended to be used and in a manner foreseeable to the Defendants.

56.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and required medical monitoring.

10

57.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-spouse has suffered, and will continue to suffer, great pain and suffering, mental anguish, a loss of society, consortium, companionship, support, dependency and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT III

## JANICE E. BRADFORD WEST v. DEFENDANTS

58.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

59.     The Defendants expressly and impliedly warranted that the asbestos and asbestos-containing products that they mined, processed, manufactured, designed, supplied, delivered, and sold were fit for use, were merchantable, and were reasonably safe for the purpose intended.

60.     The Defendants breached their warranty in that the asbestos and asbestos-containing products were defective, unsafe, unreasonably dangerous, ultra-hazardous, and unsuitable for the purpose intended.

61.     As a direct and proximate result of the breach by the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, required medical monitoring, was otherwise damaged.

11

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 11:30 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:18-cv-00680-WES-LDA Document 91-1 Filed 02/05/19 Page 104 of 158 PageID #: 2017

62.     As a direct and proximate result of the breach by the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## **COUNT IV**

63.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

64.     The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/14/2018 12:00 AM
Envelope: 1693607
Reviewer: Lynn G.

## COUNT V

### AGAINST INTERNATIONAL PAPER COMPANY, KIMBERLY-CLARK CORPORATION; SAPPI FINE PAPER NORTH AMERICA; and MAINE YANKEE ATOMIC POWER COMPANY

65.     The condition of Plaintiff is a direct and proximate result of the negligence of the Defendants, both jointly and severally, in that as premise owners, owned and/or operated premises that were unsafe due to a latent hazardous condition, i.e. transportable, respirable asbestos dust and fibers, as follows:

a.     The Defendants knew that asbestos was present in their mills;

b.     The Defendants failed to advise Plaintiff and/or his employer that he might encounter asbestos in the form of block insulation, pipe covering, gaskets, packing, and other forms during the course of his working at the premises;

c.     The Defendants failed to advise Plaintiff and/or his employer that protective equipment should be utilized when working in areas in which asbestos could be encountered;

d.     The Defendants failed to maintain their premises in a reasonably safe condition and/or properly mark those areas in which asbestos in its' various forms could be encountered;

e.     The Defendants failed to test and properly identify where asbestos could be encountered within their mill, prior to business invitees such as Plaintiff coming onto the premises to perform work; and

f.     The Defendants are negligent for otherwise failing to comply with the applicable State and Federal laws and standards for protecting a business invitee such as Plaintiff.

WEHREFORE Plaintiffs demand damages of Defendants, jointly and severally, plus interest, costs and whatever other further relief this Honorable Court deems right and just.

13

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 12:12 AM
Envelope: 1693607
Reviewer: Lynn G.

## COUNT VI

66.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

67.     Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs.

68.     The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

69.     The Defendants acted in the following fashion:

a.      Metropolitan Life Insurance Company (Met Life) required a tangible _quid pro quo_ from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study revealed asbestos miners suffered from asbestosis.  The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

b.      In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of his study shows that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process.  This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

14

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 11:41 AM
Envelope: 1693607
Reviewer: Lynn G.

c.      Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

d.      In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to

15

suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

e.      On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall) Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company,) Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f.      At this November 11, 1948 meeting, these defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g.      At this meeting, the defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These defendants thereby fraudulently misrepresented the risks of

16

asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

      h.     As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the <u>Archives of Industrial Hygiene and Occupational Medicine</u> (Vol. 3, No. 1), a journal of the American Medical Association.  The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs).  Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work.  The defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

      i.     Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

      j.     The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos).  The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the A.M.A. 's

17

<u>Archives of Industrial Hygiene and Industrial Medicine</u> in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

k.     Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l.     This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m.     As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Dr. Kenneth W. Smith, Dr. Paul Cartier, Dr. Arthur J. Vorwald, Dr. Anthony J. Lanza, Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, <u>inter alia</u>, U.S. Government officials, Canadian government

18

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 11:10:00 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:18-cv-00688-WES-LDA Document 11-1 Filed 02/05/19 Page 20 of 57 PageID #: 2724

officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

       n.      Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A that asbestosis did increase a worker's chances of incurring lung cancer.

       o.      The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

       p.      By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

       q.      In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

       r.      The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk

associated with asbestos inhalation.

s.　　In 1967, the Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.　　In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newell, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

u.　　At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

v.　　The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex) Johns-Manville, and others.

w.　　In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that

20

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 11:11 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:19-cv-00088-WES-LDA Document 9-11 Filed 02/05/19 Page 22 of 27 PageID #: 4926

asbestos-containing products offered no hazard to workers who used these products.

          x.      The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

          y.      In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

          z.      In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

          aa.      In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D. caused to be published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results

21

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/14/2018 1:11 AM
Envelope: 1693607
Reviewer: Lynn G.
Case 1:19-cv-00888-WES-LDA Document 9-11 Filed 02/05/19 Page 43 of 53 PageID #: 4027

of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

bb.    In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

cc.    In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

dd.    In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ee.    In 1970, through their agents, Defendants The Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

ff.    All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza,

22

M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

70. All defendants:

a. did a tortious act in concert with the other or pursuant to a common design with them; and/or

b. knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

c. gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

71. The acts of the defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

a. The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

b. Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

i. maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

23

        ii.     assist in the continued pecuniary gain of the defendants through the sale of their products;

        iii.    influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

        iv.    to provide a defense in lawsuits brought for injury resulting from asbestos disease.

        c.     Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

        d.     Defendants individually, as members of a conspiracy, and as agents of each other intended that Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to these products.

        e.     Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

24

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/13/2018 11:11 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:18-cv-00688-WES-LDA Document 11-1 Filed 02/05/19 Page 26 of 37 PageID #: 330

f.    Plaintiffs suffered and will continue to suffer injury as a direct and proximate result of the acts alleged herein.

72.    As a direct and proximate result of the acts of the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged.

## COUNT VII

## JANICE E. BRADFORD WEST V. ALL DEFENDANTS

73.    As a direct and proximate result of the acts of the Defendants, Plaintiff-spouse has been damaged as follows:

a.    Plaintiff has been and will continue to be deprived of the services, society and companionship of her husband;

b.    Plaintiff has been required to spend money for medicine, medical care, nursing, hospital and surgical attention, medical appliances, and household care for the treatment of her husband;

c.    Plaintiff has been and may be deprived of the household contribution of her husband; loss of pension and social security benefits.

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:10 AM
Envelope: 1693607
Reviewer: Lynn G.

Plaintiffs hereby demand a trial by jury.

By their attorneys,

*/s/ Vincent L. Greene*

Robert J. McConnell, Esq. (#3888)
Vincent L. Greene, Esq. (#5971)
**MOTLEY RICE LLC**
55 Cedar Street
Suite 100
Providence, RI  02903
401-457-7700
401-457-7708 Fax

Providence, RI

Dated:  August. 31, 2018

# EXHIBIT B



STATE OF RHODE ISLAND AND     PROVIDENCE PLANTATIONS

# SUPERIOR COURT

## SUMMONS

| | |
|---|---|
| | **Civil Action File Number**<br>PC-2018-6293 |
| **Plaintiff**<br>Merle C. West<br>v.<br>**Defendant**<br>Air & Liquid Systems Corporation | **Attorney for the Plaintiff or the Plaintiff**<br>Vincent L. Greene, Iv<br>**Address of the Plaintiff's Attorney or the Plaintiff**<br>55 CEDAR STREET<br>SUITE 100<br>PROVIDENCE RI  02903 |
| Licht Judicial Complex<br>Providence/Bristol County<br>250 Benefit Street<br>Providence RI  02903<br>(401) 222-3250 | **Address of the Defendant**<br>CT Corporation System<br>450 Veterans Memorial Parkway, Suite 7A<br>East Providence, RI  02914<br>Defendant: General Electric Company |

**TO THE DEFENDANT, General Electric Company:**

The above-named Plaintiff has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon the Plaintiff's attorney, whose address is listed above, an answer to the complaint which is herewith served upon you within twenty (20) days after service of this Summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Your answer must also be filed with the court.

As provided in Rule 13(a) of the Superior Court Rules of Civil Procedure, unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

| | |
|---|---|
| This Summons was generated on 8/31/2018. | /s/ Henry Kinch<br>Clerk |

Witness the seal/watermark of the Superior Court

A true copy attest

#  6070

Date  9, 7, 18

SC-CMS-1 (revised July 2014)



STATE OF RHODE ISLAND AND     PROVIDENCE PLANTATIONS

## SUPERIOR COURT

| | |
|---|---|
| **Plaintiff**<br>Merle C. West<br>    v.<br>**Defendant**<br>Air & Liquid Systems Corporation | **Civil Action File Number**<br>PC-2018-6293 |

### PROOF OF SERVICE

I hereby certify that on the date below I served a copy of this Summons, complaint, Language Assistance Notice, and all other required documents received herewith upon the Defendant, General Electric Company, by delivering or leaving said papers in the following manner:

☐ With the Defendant personally.

☐ At the Defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person of suitable age and discretion _____

Address of dwelling house or usual place of abode _____

_____

Age _____

Relationship to the Defendant _____

☐ With an agent authorized by appointment or by law to receive service of process.

Name of authorized agent _____

If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.

_____

☐ With a guardian or conservator of the Defendant.

Name of person and designation _____

☐ By delivering said papers to the attorney general or an assistant attorney general if serving the state.

☐ Upon a public corporation, body, or authority by delivering said papers to any officer, director, or manager.

Name of person and designation _____

Page 1 of 2

SC-CMS-1 (revised July 2014)



STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPERIOR COURT

Upon a private corporation, domestic or foreign:

☐ By delivering said papers to an officer or a managing or general agent.

　　Name of person and designation _____

☐ By leaving said papers at the office of the corporation with a person employed therein.

　　Name of person and designation _____

☐ By delivering said papers to an agent authorized by appointment or by law to receive service of process.

Name of authorized agent _____

If the agent is one designated by statute to receive service, further notice as required by statute was given as noted below.

_____

☐ I was unable to make service after the following reasonable attempts: _____

| SERVICE DATE: ___ / ___ / ___ | SERVICE FEE $_____ |
| Month Day Year | |

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____

Signature

State of _____

County of _____

On this _____ day of _____, 20___, before me, the undersigned notary public, personally appeared _____ ☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____

My commission expires: _____

Notary identification number: _____

Page 2 of 2

SC-CMS-1 (revised July 2014)

STATE OF RHODE ISLAND                    SUPERIOR COURT
PROVIDENCE, SC


MERLE C. WEST and JANICE E. BRADFORD WEST,
his wife,

    *Plaintiffs,*

    v.                                    CIVIL ACTION NO.:

AIR & LIQUID SYSTEMS CORPORATION,
AURORA PUMP COMPANY,
ARMSTRONG PUMPS, INC.,
ALBANY INTERNATIONAL, a Corporation,
ALLIED GLOVE CORPORATION,
BAYER CROPSCIENCE f/k/a Amchem PRODUCTS,
BELL & GOSSETT,
BSM PUMP CORP. formerly BROWN AND SHARPE,
CBS CORPORATION,
CRANE COMPANY,
DEZURIK, INC.,
EATON CORPORATION,
ECR INTERNATIONAL, as successor-in-interest to Utica Boiler Company,
FLOWSERVE CORPORATION,
FOSTER WHEELER , LLC,
VIACOM INC.,
GARDNER-DENVER, INC.,
GENERAL ELECTRIC COMPANY,
GOULD PUMPS,
GRINNELL, LLC,
HAMMOND VALVE COMPANY,
HONEYWELL INTERNATIONAL, INC.,
IMO INDUSTRIES, INC.,
INDUSTRIAL HOLDINGS CORPORATION f/k/a Carborundum Co.,
INGERSOLL-RAND COMPANY,
INTERNATIONAL PAPER CO.,
MAINE YANKEE ATOMIC POWER COMPANY,
METROPOLITAN LIFE INSURANCE COMPANY,
MILWAUKEE VALVE CO,
NEW ENGLAND INSULATION, INC.,
NEW YORKER BOILER COMPANY,
THE WM. POWELL COMPANY,
P.I.C. CONTRACTORS, INC.,
PACKINGS & INSULATIONS CORPORATION,

1

RAINBIRD CORPORATION,
KIMBERLY-CLARK CORPORATION,
    successor-in-interest to Scott Paper Company,
WARREN PUMPS,
PEERLESS PUMPS, INC.,
SAPPI FINE PAPER NORTH AMERICA,
    successor-in-interest to S. D. Warren Company,
SEARS ROEBUCK & COMPANY,
SID HARVEY INDUSTRIES, INC.,
    Successor-in-interest to Sid Harvey of New England, Inc.,
THE GAGE COMPANY,
TRANE COMPANY, successor-in-interest to American Standard, Inc.,
VELAN VALVE CORPORATION,
F. W. WEBB COMPANY,
WHEELER PROTECTIVE APPAREL, INC.,

    *Defendants.*

## COMPLAINT AND JURY DEMAND

1.    Plaintiffs Merle C. West and Janice E. West, his wife are individuals residing at 1098 West Alna Road, Alna, ME 04535.

2    Plaintiff Merle C. West worked as a boilermaker and machinist at Bath Iron Works from 1967 to 1972 and from 1978 to 1987; as a carpenter-millwright for Cianbro and for other contractors between 1988 and 1999 at various industrial sites.

3.    Defendant Air & Liquid Systems Corporation is the successor-in-interest to Buffalo Pumps, Inc. is a Delaware corporation with its principal place of business in Albany, New York and at all relevant times it did business in the States of Rhode Island and Maine.

4.    Defendant Aurora Pump Company is a North Carolina corporation with its principal place of business in Illinois and at all relevant times it did business in the State of Rhode Island and in the States of Rhode Island and Maine.

2

5.    Defendant Armstrong Pumps, Inc. is a New York corporation with its principal place of business in the State of New York and at all times relevant did business in the States of Rhode Island and Maine.

6.    Defendant Albany International, Inc. is a Delaware Corporation with its principal place of business in Albany, New York and at all times relevant did business in the States of Rhode Island and Maine.

7.    Defendant Allied Glove Corporation is a Delaware corporation with its principal place of business located in Milwaukee, WI and at all times relevant did business in the State of Rhode Island and Maine.

8.    Defendant Bayer Cropscience, Inc. is a Delaware corporation with its principal place of business in Pennsylvania and at all times relevant it did business in the States of Rhode Island and Maine.

9.    Defendant Bell & Gossett is an Illinois corporation with its principal place of business in Morton Grove, Ill and at all times relevant did business in the States of Rhode Island Maine.

10.   Defendant BSM Pump Corp. formerly Brown and Sharpe is a Rhode Island corporation with its principal place of business located in N. Kingstown, RI and at all times relevant also did business in the State of Maine.

11.   Defendant CBS Corporation, n/k/a Viacom, Inc., is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of Rhode Island and Maine.

12.   Defendant Crane Co. is a New Jersey corporation with its principal place of

3

Case Number: PC-2018-8293
Filed in Providence/Bristol County Superior Court SESDA Document 1-1 Filed 02/05/19 Page 126 of 158 PageID #: 4139
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

business in New Jersey. At all relevant times it did business in the States of Rhode Island and Maine.

13.    Defendant DeZurik, Inc. is a Kansas corporation with its principal place of business located in Ellsworth, KS and at all times relevant did business in the States of Rhode Island and Maine.

14.    Defendant Eaton Corporation, successor-in-interest to Cutler-Hammer, Inc. is an Ohio corporation with its principal place of business located in Cleveland, Ohio and at all times relevant did business in the States of Rhode Island and Maine.

15.    Defendant ECR International is a New York corporation with its principal place of business in New York, is successor-in-interest to Utica Boiler Company and at all times relevant hereto did business in the State of Rhode Island and State of Maine.

16.    Defendant Flowserve Corporation, successor-in-interest to Durametallic is a Michigan corporation with its principal place of business located in Kalamazoo, MI and at all times relevant did business in the States of Rhode Island and Maine.

17.    Defendant Foster Wheeler, LLC is a New York corporation with its principal place of business located in New Jersey and at all times relevant did business in the States of Rhode island and Maine.

18.    Defendant Gardner-Denver, Inc. is a Pennsylvania corporation with principal place of business located in Philadelphia, Pa. and at all times relevant did business in the States of Rhode Island and Maine.

19    Defendant General Electric Company is a New York corporation with its principal place of business in New York and at all relevant times it did business in the States of

4

Case 1:19-cv-00636-JJM-LDA Document 1-1 Filed 12/05/19 Page 127 of 158 PageID #: 4340

Rhode Island and Maine.

20.     Defendant <u>Gould Pumps</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island and Maine.

21.     Defendant <u>Grinnell, LLC</u> is a Mississippi corporation with principal place of business located in Upper Saddle River, New Jersey and at all times relevant did business in the States of Maine and Rhode Island.

22.     Defendant <u>Hammond Valve Company</u> is a Wisconsin corporation with its principal place of business located in New Berlin, WI and at all times relevant did business in the States of Rhode Island and Maine.

23.     Defendant <u>Honeywell International, Inc.</u> is a Delaware corporation, having its principal place of business located in Pittsburgh, Pa. and is qualified to do business in the States of Rhode Island and Maine.

24.     The <u>Defendant, IMO Industries, Inc.,</u> f/k/a IMO Delaval, Inc., f/k/a Transamerica DeLaval, Inc., f/k/a DeLaval Turbine, Inc., DeValco Corporation is a corporation incorporated under the laws of the state of New York, having its principal place of business located in New York, and at all times relevant did business in the States of Rhode Island and Maine.

25.     Defendant <u>Industrial Holdings Corp.</u> successor-in-interest to Carborundum Company is a New York corporation with principal place of business located in New York and at all times relevant did business in the States of Rhode Island and Maine.

25.     Defendant <u>Ingersoll-Rand Co.</u> is a New Jersey corporation with its principal place of business in New Jersey and at all relevant times it did business in the States of Rhode Island

5

and Maine.

26.    Defendant International Paper Company is a New York corporation with its principal place of business in Memphis, TN and at all relevant times did business in the States of Rhode Island and Maine.

27.    Defendant Maine Yankee Atomic Power Company is a Maine corporation with principal place of business located in Wiscasset, ME is successor-in-interest to Maine Yankee, Inc. and at all times relevant did business in the States of Maine and Rhode Island.

28.    Defendant Metropolitan Life Insurance Company is a mutual life insurance company of the State of New York with its principal place of business in the State of New York and at all relevant times it did business in the States of Rhode Island and Maine.

29.    Defendant Milwaukee Valve Co. is a Wisconsin corporation with principal place of business located in Madison, WI and at all times relevant did business in the States of Rhode Island and Maine.

30.    Defendant New England Insulation, Inc. is a Massachusetts corporation with its principal place of business located in Canton, Massachusetts and at all times relevant did business in the State of Rhode Island and Maine.

31    Defendant New Yorker Boiler Company is a Pennsylvania corporation with its principal place of business located in Hatfield, Pa. and at all times relevant did business in the States of Maine and Rhode Island.

32.    Defendant P.I.C. Contractors, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island. At all relevant times it did business in the States of Rhode Island and Maine.

33.    Defendant Packings and Insulations Corporation is a Rhode Island corporation

6

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:19-cv-00069-WES-LDA Document 11-2 Filed 02/13/19 Page 129 of 158 PageID #: 4542

with its principal place of business in Rhode Island and at all relevant times it did business in the
States of Rhode Island and Maine.

34.     Defendant Rainbird Corporation is a California corporation with principal place
of business located in Azsa, CA, is successor-in-interest to Hammond Valve Company and at all
times relevant did business in the States of Rhode Island and Maine.

35.     Defendant Kimberly-Clark Corporation is a Delaware corporation with its
principal place of business located in Irving, TX and at all relevant times did business in the
States of Rhode Island and Maine.

36.     Defendant Peerless Pumps, Inc. is a Delaware corporation with principal place of
business located in Indianapolis, IN and at all times relevant did business in the State of Rhode
Island and State of Maine.

37.     Defendant Sappi Fine Paper North America is the successor-in-interest to S. D.
Warren Paper is a Delaware Corporation with principal place of business located in Pennsylvania
and at all times relevant did business in the State of Rhode Island and State of Maine.

38.     Defendant Warren Pumps is a Massachusetts corporation with its principal place
of business in Massachusetts and. at all relevant times it did business in the States of Rhode
Island and Maine.

39.     Defendant Sears Roebuck & Company is a New York corporation with its
principal place of business in Chicago, and at all times relevant did business in the State of
Rhode Island and State of Maine.

40.     Defendant Sid Harvey Industries, Inc., successor-in-interest to Sid Harvey of New
England, Inc. is a New York corporation with its principal place of business in Garden City, NY

7

and at all times material relevant did business in the State of Rhode Island and Maine.

41.     Defendant The Gage Company is a Pennsylvania corporation with its principal place of business located in Portland, ME and at all times relevant did business in the States of Rhode Island and Maine.

42.     Defendant Trane Company, successor-in-interest to American Standard, Inc. is a Delaware corporation with principal place of business located in Michigan and at all times relevant did business in the State of Rhode Island and State of Maine.

43.     The Defendant, Velan Valve Corporation, is a corporation incorporated under the laws of the State of New York, with its principal place of business located in the State of Vermont and all times relevant did business in the States of Rhode Island and Maine.

44.     The Defendant F. W. Webb Company is a Massachusetts corporation with principal offices located in Bedford, MA and at all times relevant did business in the State of Maine and State of Rhode Island.

45.     Defendant Wheeler Protective Apparel, Inc., is a New Hampshire corporation with principal place of business located in the State of Illinois and at all times relevant did business in the States of Rhode Island and Maine

## COUNT I

46.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

47.     Defendants mined, processed, manufactured, designed, supplied, delivered, and sold asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so, at all times relevant herein.

48.     While at work, Plaintiff was caused to inhale, absorb, ingest, and come into contact with asbestos and asbestos-containing products mined, processed, manufactured, designed, supplied, delivered, and/or sold by Defendants.

49.     The Defendants were negligent in that they each, jointly and severally:

      a.     mined, processed, manufactured, designed, supplied, delivered, and/or sold asbestos and asbestos-containing products, and/or knowingly gave substantial assistance or encouragement to those who did so, that they knew, or reasonably should have known, were dangerous, defective, poisonous, and harmful to an individual's health, body, and life;

      b.     failed to reasonably warn Plaintiff of the harmful effects of exposure to asbestos and asbestos-containing products and/or knowingly gave substantial assistance or encouragement to those who did so;

      c.     failed to provide Plaintiff with the knowledge as to possible precautions to protect against the harmful effects of asbestos exposure and/or knowingly gave substantial assistance or encouragement to those who did so; and,

      d.     were otherwise negligent.

50.     As a direct and proximate result of the negligence of the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

51.     As a direct and proximate result of the negligence of the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

9

Case Number: PC-2018-8293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

Case 1:19-cv-00099-JJM-LDA Document 11-2 Filed 02/05/19 Page 132 of 158 PageID #: 4845

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT II

52.  Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

53.  At all relevant times, the Defendants, as part of their regular business, mined, processed, manufactured, designed, supplied, delivered, and sold and/or knowingly gave substantial assistance or encouragement to those who did so, asbestos and asbestos-containing products and put them into the stream of commerce in a defective, unsafe, and inherently dangerous condition, and failed to provide reasonable warnings.

54.  The asbestos and asbestos-containing products were expected to, and did reach such persons, including Plaintiff, without substantial change in the condition in which they were sold and/or supplied.

55.  At all relevant times, the asbestos and asbestos-containing products were used and employed for the purposes for which they were mined, processed, manufactured, designed, supplied, delivered, sold, and intended to be used and in a manner foreseeable to the Defendants.

56.  As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and required medical monitoring.

10

57.     As a direct and proximate result of the defective, dangerous, and unsafe condition of the asbestos and asbestos-containing products that Defendants placed into the stream of commerce, Plaintiff-spouse has suffered, and will continue to suffer, great pain and suffering, mental anguish, a loss of society, consortium, companionship, support, dependency and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT III

## JANICE E. BRADFORD WEST v. DEFENDANTS

58.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

59.     The Defendants expressly and impliedly warranted that the asbestos and asbestos-containing products that they mined, processed, manufactured, designed, supplied, delivered, and sold were fit for use, were merchantable, and were reasonably safe for the purpose intended.

60.     The Defendants breached their warranty in that the asbestos and asbestos-containing products were defective, unsafe, unreasonably dangerous, ultra-hazardous, and unsuitable for the purpose intended.

61.     As a direct and proximate result of the breach by the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, required medical monitoring, was otherwise damaged.

11

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

62.     As a direct and proximate result of the breach by the Defendants, Plaintiff-spouse has suffered, and will continue to suffer great pain and suffering, mental anguish, a loss of consortium, society, companionship, support, and dependency, and was otherwise damaged.

WHEREFORE Plaintiffs demand judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT IV

63.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

64.     The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

12

## COUNT V

### AGAINST INTERNATIONAL PAPER COMPANY,
### KIMBERLY-CLARK CORPORATION;
### SAPPI FINE PAPER NORTH AMERICA; and
### MAINE YANKEE ATOMIC POWER COMPANY

65.     The condition of Plaintiff is a direct and proximate result of the negligence of the

Defendants, both jointly and severally, in that as premise owners, owned and/or operated

premises that were unsafe due to a latent hazardous condition, i.e. transportable, respirable

asbestos dust and fibers, as follows:

     a.     The Defendants knew that asbestos was present in their mills;

     b.     The Defendants failed to advise Plaintiff and/or his employer that he might

encounter asbestos in the form of block insulation, pipe covering, gaskets, packing, and other

forms during the course of his working at the premises;

     c.     The Defendants failed to advise Plaintiff and/or his employer that protective

equipment should be utilized when working in areas in which asbestos could be encountered;

     d.     The Defendants failed to maintain their premises in a reasonably safe condition

and/or properly mark those areas in which asbestos in its' various forms could be encountered;

     e.     The Defendants failed to test and properly identify where asbestos could be

encountered within their mill, prior to business invitees such as Plaintiff coming onto the

premises to perform work; and

     f.     The Defendants are negligent for otherwise failing to comply with the applicable

State and Federal laws and standards for protecting a business invitee such as Plaintiff.

WEHREFORE Plaintiffs demand damages of Defendants, jointly and severally, plus

interest, costs and whatever other further relief this Honorable Court deems right and just.

13

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

## COUNT VI

66.     Plaintiffs repeat and re-allege all allegations contained in all paragraphs above as if fully set forth herein.

67.     Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs.

68.     The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

69.     The Defendants acted in the following fashion:

        a.      Metropolitan Life Insurance Company (Met Life) required a tangible <u>quid pro quo</u> from McGill University in the 1920s in exchange for them providing funding for a study of asbestos disease in Canadian miners.  The study revealed asbestos miners suffered from asbestosis.  The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

        b.      In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted the Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey.  The report of his study shows that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process.  This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issue of asbestos disease.  Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

14

Case Number PC-2018-6293
Filed In Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

   c. Beginning in approximately 1934, Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurers of Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the asbestos industry that affirmatively misrepresented asbestos as a disease process less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. The defendants were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and others, as well as Met Life, the insurer.

   d. In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company, and United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to

15

Case 1:19-cv-00689-WES-SDA AD Document 11-2 Filed 02/05/19 Page 138 of 158 PageID #: 4451

suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

e.  On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall) Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company,) Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

f.  At this November 11, 1948 meeting, these defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

g.  At this meeting, the defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published it in the medical literature as edited by Dr. Arthur Vorwald. The acts of these defendants were carried out by co-conspirator Defendant Met Life's agent, Dr. Lanza. These defendants thereby fraudulently misrepresented the risks of

16

asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

h.     As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the <u>Archives of Industrial Hygiene and Occupational Medicine</u> (Vol. 3, No. 1), a journal of the American Medical Association.   The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values (TLVs).  Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work.  The defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading Dr. Vorwald publication to university libraries, government officials, medical doctors, agencies, the public, and others.

i.     Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

j.     The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):   Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation) National Gypsum Company (n/k/a Asbestos Claims Management Corporation), and Turner & Newall (individually and successor to Bell Asbestos).  The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the A.M.A. 's

17

Archives of Industrial Hygiene and Industrial Medicine in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators all indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

k.      Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

l.      This plan of misrepresentation and influence over the medical literature began on or about 1950 when the Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

m.      As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Dr. Kenneth W. Smith, Dr. Paul Cartier, Dr. Arthur J. Vorwald, Dr. Anthony J. Lanza, Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. Government officials, Canadian government

18

officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

n.     Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A that asbestosis did increase a worker's chances of incurring lung cancer.

o.     The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

p.     By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

q.     In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

r.     The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk

19

Case 3:19-cv-SL-AD Document 11-2 Filed 02/05/19 Page 142 of 158 PageID #: 4855

associated with asbestos inhalation.

s.      In 1967, the Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

t.      In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

u.      At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac agreement required by the asbestos industry members.

v.      The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Philip-Carey Corporation (predecessors to Celotex) Johns-Manville, and others.

w.      In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that

20

asbestos-containing products offered no hazard to workers who used these products.

        x.    The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego Turner & Newall), National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

        y.    In 1947, the members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

        z.    In 1953, conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

        aa.    In 1955, conspirator Johns-Manville, through its agent Kenneth W. Smith, M.D. caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results

21

of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

bb.    In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

cc.    In 1957, the members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

dd.    In 1964 the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

ee.    In 1970, through their agents, Defendants The Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these Defendants.

ff.    All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza,

22

M.D., acting on behalf of Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

70.    All defendants:

        a.    did a tortious act in concert with the other or pursuant to a common design with them; and/or

        b.    knew that each other's conduct constituted a breach of duty and they each gave substantial assistance or encouragement to the other so to conduct himself; and/or

        c.    gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

71.    The acts of the defendants as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

        a.    The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

        b.    Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

        i.    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

23

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

        ii.     assist in the continued pecuniary gain of the defendants through the sale of their products;

        iii.    influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

        iv.    to provide a defense in lawsuits brought for injury resulting from asbestos disease.

        c.     Plaintiffs reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to asbestos because of a belief that it was safe.

        d.     Defendants individually, as members of a conspiracy, and as agents of each other intended that Plaintiffs rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to these products.

        e.     Defendants individually, as members of a conspiracy, as agents of each other, as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiffs had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

24

Case Number: PC-2018-6293
Filed in Providence/Bristol County Superior Court
Submitted: 8/31/2018 11:01 AM
Envelope: 1693607
Reviewer: Lynn G.

f.      Plaintiffs suffered and will continue to suffer injury as a direct and proximate result of the acts alleged herein.

72.     As a direct and proximate result of the acts of the Defendants, Plaintiff-worker suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, and was otherwise damaged.

## COUNT VII

### JANICE E. BRADFORD WEST V. ALL DEFENDANTS

73.     As a direct and proximate result of the acts of the Defendants, Plaintiff-spouse has been damaged as follows:

a.      Plaintiff has been and will continue to be deprived of the services, society and companionship of her husband;

b.      Plaintiff has been required to spend money for medicine, medical care, nursing, hospital and surgical attention, medical appliances, and household care for the treatment of her husband;

c.      Plaintiff has been and may be deprived of the household contribution of her husband; loss of pension and social security benefits.

WHEREFORE Plaintiff demands judgment and damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

Plaintiffs hereby demand a trial by jury.

By their attorneys,

*/s/ Vincent L. Greene*

Robert J. McConnell, Esq. (#3888)
Vincent L. Greene, Esq. (#5971)
***MOTLEY RICE LLC***
55 Cedar Street
Suite 100
Providence, RI 02903
401-457-7700
401-457-7708 Fax

Providence, RI

Dated: August. 31, 2018

26

# EXHIBIT C

 CT Corporation

**Service of Process Transmittal**
09/07/2018
CT Log Number 534013950

| | |
|---|---|
| **TO:** | Julie Klusza<br>Electric Insurance Company<br>75 Sam Fonzo Dr<br>Beverly, MA 01915-1000 |
| **RE:** | **Process Served in Rhode Island** |
| **FOR:** | General Electric Company  (Domestic State: NY) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Merle C. West and Janice E. Bradford West, etc., Pltf. vs. Air & Liquid Systems Corporation, et al., Dfts. // To: General Electric Company |
| **DOCUMENT(S) SERVED:** | Summons, Proof, Attachment, Complaint |
| **COURT/AGENCY:** | STATE OF RHODE ISLAND PROVIDENCE - SUPERIOR COURT, RI<br>Case # PC20186293 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, East Providence, RI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/07/2018 at 10:30 |
| **JURISDICTION SERVED :** | Rhode Island |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service of this Summons upon you, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Vincent L. Greene, Esq.<br>MOTLEY RICE LLC<br>55 Cedar Street<br>Suite 100<br>PROVIDENCE, RI 02903<br>401-457-7700 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780122258292<br><br>Image SOP<br><br>Email Notification,  Cath Mohan  cmohan@McCarter.com<br><br>Email Notification,  Cathy Hopson  Chopson@McCarter.com<br><br>Email Notification,  Julie Klusza  Julie.Klusza@electricinsurance.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 450 Veterans Memorial Parkway<br>Suite 7A<br>East Providence, RI 02914 |
| **TELEPHONE:** | 312-345-4336 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# EXHIBIT D

STATE OF RHODE ISLAND                          SUPERIOR COURT

PROVIDENCE                                     C.A. NO. PC 18-6293

MERLE C. WEST and
JANICE E. BRADFORD WEST

                Plaintiff(s),

v.

AIR & LIQUID SYSTEMS CORPORATION, et al.
                Defendants.

## NOTICE OF FILING OF NOTICE OF REMOVAL
## TO THE UNTIED STATES DISTRICT COURT

**TO THE JUDGES OF THE SUPERIOR COURT OF THE STATE OF RHODE ISLAND, WITHIN AND FOR THE SUPERIOR COURT AT PROVIDENCE, AND TO ALL PARTIES TO THIS ACTION:**

      Defendant General Electric Co., hereby gives notice to the Court that they have removed

the above-captioned lawsuit to the United States District Court for the District of Rhode Island

on December 18, 2018. A copy of this Notice of Removal is attached hereto.


                DEFENDANT,
                GENERAL ELECTRIC COMPANY,


Dated: December 19, 2018

                */s/* Anne E. Shannon_____
                Anne E. Shannon
                RI Bar #9591
                MCCARTER & ENGLISH, LLP.
                265 Franklin Street
                Boston, MA 02110
                Phone: 617-449-6500

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Rhode Island Superior Court and a copy was sent to all counsel of record via File & ServeXpress on this 19th day of December, 2018.  The document electronically filed and served is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.


<u>Anne E. Shannon</u>
Anne E. Shannon

# EXHIBIT D

## U.S. District Court — Judicial Caseload Profile

**MAINE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sep 30 2013 | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 767 | 757 | 896 | 906 | 819 | 819 | | |
| | Terminations | | 736 | 734 | 852 | 928 | 846 | 783 | | |
| | Pending | | 609 | 626 | 670 | 645 | 623 | 658 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 6.8 | 8.2 | -8.6 | -9.6 | | | 63 | 4 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 2.0 | 6.9 | 0.0 | 0.0 | 3.1 | 12.0 | | |
| **Actions per Judgeship** | Filings | Total | 256 | 252 | 299 | 302 | 273 | 273 | 86 | 5 |
| | | Civil | 162 | 167 | 189 | 215 | 175 | 173 | 83 | 4 |
| | | Criminal Felony | 71 | 62 | 79 | 55 | 67 | 68 | 65 | 3 |
| | | Supervised Release Hearings | 23 | 23 | 31 | 32 | 32 | 32 | 54 | 1 |
| | Pending Cases [2] | | 203 | 209 | 223 | 215 | 208 | 219 | 91 | 5 |
| | Weighted Filings [2] | | 249 | 240 | 294 | 268 | 250 | 251 | 87 | 5 |
| | Terminations | | 245 | 245 | 284 | 309 | 282 | 261 | 84 | 3 |
| | Trials Completed | | 21 | 20 | 17 | 19 | 20 | 20 | 28 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.7 | 10.2 | 9.8 | 9.4 | 10.1 | 9.4 | 44 | 2 |
| | | Civil [2] | 7.6 | 8.4 | 7.4 | 6.0 | 7.3 | 7.8 | 28 | 1 |
| | From Filing to Trial [2] (Civil Only) | | - | 22.8 | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 3 .8 | 6 1.4 | 8 1.8 | 7 1.5 | 9 2.0 | 15 3.3 | 20 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.3 | 1.3 | 1.1 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 78.3 | 41.1 | 43.8 | 38.9 | 30.9 | 42.1 | | |
| | | Percent Not Selected or Challenged | 18.1 | 22.1 | 29.1 | 23.8 | 23.4 | 20.6 | | |

| 2018 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 519 | 142 | 19 | 42 | 2 | 26 | 39 | 47 | 44 | 4 | 111 | - | 43 |
| Criminal [1] | 203 | 6 | 94 | 11 | 35 | 17 | 13 | 12 | - | 1 | 1 | 7 | 6 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**RHODE ISLAND**

| | | | Sep 30 2013 | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Overall Caseload Statistics** | Filings [1] | | 1,283 | 851 | 705 | 826 | 768 | 916 | | |
| | Terminations | | 1,750 | 2,016 | 1,469 | 709 | 872 | 773 | | |
| | Pending | | 2,706 | 1,547 | 786 | 894 | 792 | 938 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -28.6 | 7.6 | 29.9 | 10.9 | 19.3 | | 12 | 2 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | Filings | Total | 428 | 284 | 235 | 275 | 256 | 305 | 84 | 4 |
| | | Civil | 353 | 220 | 180 | 228 | 195 | 230 | 76 | 3 |
| | | Criminal Felony | 63 | 53 | 41 | 38 | 41 | 61 | 75 | 4 |
| | | Supervised Release Hearings | 12 | 10 | 14 | 9 | 20 | 15 | 80 | 5 |
| | Pending Cases [2] | | 902 | 516 | 262 | 298 | 264 | 313 | 80 | 4 |
| | Weighted Filings [2] | | 323 | 258 | 230 | 248 | 237 | 308 | 79 | 4 |
| | Terminations | | 583 | 672 | 490 | 236 | 291 | 258 | 85 | 4 |
| | Trials Completed | | 9 | 7 | 9 | 5 | 7 | 2 | 94 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.2 | 8.1 | 9.2 | 9.2 | 11.2 | 8.3 | 27 | 1 |
| | | Civil [2] | 32.9 | 22.0 | 28.9 | 10.7 | 10.5 | 8.4 | 37 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 31.0 | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 1,035 / 40.9 | 587 / 41.5 | 103 / 15.6 | 61 / 7.9 | 60 / 9.1 | 70 / 9.6 | 65 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.2 | 1.1 | 1.3 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 91.1 | 77.7 | 62.0 | 49.8 | 42.9 | 56.6 | | |
| | | Percent Not Selected or Challenged | 55.2 | 55.1 | 36.9 | 33.4 | 42.0 | 25.8 | | |

Numerical Standing Within

### 2018 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 690 | 73 | 40 | 47 | 13 | 53 | 56 | 103 | 78 | 9 | 135 | - | 83 |
| Criminal [1] | 182 | - | 85 | 14 | 23 | 28 | 7 | 15 | 1 | 4 | 1 | - | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

Table C-1.
U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Period Ending March 31, 2018

| Circuit and District | Total Civil Cases | | | | U.S. Civil Cases | | | | Private Civil Cases | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Pending March 31, 2017¹ | Commenced | Terminated | Pending March 31, 2018 | Pending March 31, 2017¹ | Commenced | Terminated | Pending March 31, 2018 | Pending March 31, 2017¹ | Commenced |
| Total | 349,272 | 277,010 | 286,969 | 339,313 | 51,820 | 43,604 | 48,235 | 47,189 | 297,452 | 233,406 |
| DC | 3,024 | 3,030 | 2,643 | 3,411 | 1,575 | 1,460 | 1,205 | 1,830 | 1,449 | 1,570 |
| 1st | 11,754 | 6,271 | 7,241 | 10,784 | 1,794 | 1,322 | 1,502 | 1,614 | 9,960 | 4,949 |
| ME | 484 | 524 | 575 | 433 | 157 | 187 | 187 | 157 | 327 | 337 |
| MA | 7,545 | 3,096 | 4,008 | 6,633 | 704 | 538 | 655 | 587 | 6,841 | 2,558 |
| NH | 526 | 864 | 486 | 904 | 159 | 147 | 176 | 130 | 367 | 717 |
| RI | 705 | 644 | 640 | 709 | 163 | 127 | 163 | 127 | 542 | 517 |
| PR | 2,494 | 1,143 | 1,532 | 2,105 | 611 | 323 | 321 | 613 | 1,883 | 820 |
| 2nd | 29,190 | 25,520 | 24,400 | 30,310 | 5,101 | 4,766 | 4,246 | 5,621 | 24,089 | 20,754 |
| CT | 2,474 | 2,275 | 2,324 | 2,425 | 504 | 444 | 453 | 495 | 1,970 | 1,831 |
| NY,N | 1,879 | 1,673 | 1,812 | 1,740 | 467 | 464 | 437 | 494 | 1,412 | 1,209 |
| NY,E | 10,052 | 7,719 | 7,992 | 9,779 | 1,454 | 1,199 | 1,199 | 1,454 | 8,598 | 6,520 |
| NY,S | 11,779 | 11,082 | 10,104 | 12,757 | 1,501 | 1,225 | 1,249 | 1,477 | 10,278 | 9,857 |
| NY,W | 2,691 | 2,505 | 1,901 | 3,295 | 1,036 | 1,336 | 780 | 1,592 | 1,655 | 1,169 |
| VT | 315 | 266 | 267 | 314 | 139 | 98 | 128 | 109 | 176 | 168 |
| 3rd | 23,632 | 33,169 | 23,389 | 33,412 | 3,777 | 3,641 | 3,688 | 3,730 | 19,855 | 29,528 |
| DE | 1,894 | 2,111 | 2,028 | 1,977 | 112 | 67 | 66 | 113 | 1,782 | 2,044 |
| NJ | 10,303 | 18,798 | 9,047 | 20,054 | 1,102 | 1,359 | 1,317 | 1,144 | 9,201 | 17,439 |
| PA,E | 6,266 | 6,917 | 7,080 | 6,103 | 1,170 | 811 | 880 | 1,101 | 5,096 | 6,106 |
| PA,M | 2,807 | 2,604 | 2,508 | 2,903 | 850 | 898 | 905 | 843 | 1,957 | 1,706 |
| PA,W | 1,937 | 2,590 | 2,566 | 1,961 | 443 | 473 | 480 | 436 | 1,494 | 2,117 |
| VI | 425 | 149 | 160 | 414 | 100 | 33 | 40 | 93 | 325 | 116 |
| 4th | 78,347 | 19,750 | 57,256 | 40,841 | 6,875 | 4,230 | 4,989 | 6,116 | 71,472 | 15,520 |
| MD | 3,504 | 3,988 | 3,718 | 3,774 | 1,193 | 801 | 916 | 1,078 | 2,311 | 3,187 |
| NC,E | 2,143 | 1,609 | 1,677 | 2,075 | 1,101 | 635 | 674 | 1,062 | 1,042 | 974 |
| NC,M | 1,272 | 1,135 | 1,242 | 1,165 | 682 | 420 | 531 | 571 | 590 | 715 |
| NC,W | 1,198 | 1,236 | 1,249 | 1,185 | 573 | 411 | 489 | 495 | 625 | 825 |